**Philip RASTELLI, Petitioner,**

v.

**WARDEN, METROPOLITAN CORRECTIONAL CENTER, New York, New York; United States Department of Justice, Bureau of Prisons; and United States Parole Commission, Respondents.**

85 Civ. 613 (ADS).

United States District Court, S.D. New York.

June 9, 1985.

Stanley A. Teitler, New York City, for petitioner; Amy Adelson, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., New York City, for respondents; William E. Simon, Jr., New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

Philip Rastelli, who is currently incarcerated in the Metropolitan Correctional Center ("MCC") pursuant to the revocation of his mandatory release on parole, petitions for a writ of habeas corpus. Rastelli's parole was revoked because the United States Parole Commission ("Commission") found that he had associated with persons who had a criminal record in violation of an express condition of his mandatory release. Petitioner challenges this decision on several grounds. He claims that he did not in fact "associate" with persons with criminal records; that the "association" condition is unconstitutionally vague; that the Commission's findings and decisions were not based on sufficient evidence; and that its findings and decisions were arbitrary, capricious, and an abuse of discretion.

Respondents originally moved to dismiss the petition for failure to exhaust administrative remedies. At the time of that motion, petitioner had an appeal pending to the full Commission pursuant to 28 C.F.R. § 2.27 (1984), which applies to cases which have been designated as "original jurisdiction" cases under 28 C.F.R. § 2.17 (1984). Petitioner argued, however, that because the Commission would not be able to hear and decide his appeal within sixty days, as required by 18 U.S.C. § 4215(b) (1982), he was not required to follow the procedures set out in the Commission's regulations prior to seeking judicial relief. On April 3, 1985, this court ordered the parties to submit further briefing on "the question whether section 4215(b) requires that the Commission decide appeals in original jurisdiction cases within sixty days of its receipt of an appellant's papers or forfeit its right to insist on exhaustion." Order at 4. While that motion was pending, petitioner's counsel informed the court that the full Commission had affirmed the parole revocation. Accordingly, the court ordered the government to respond on the merits.

I. *Legality of 28 C.F.R. § 2.27 (1984).*

Respondents' motion to dismiss the petition for failure to exhaust administrative remedies became moot when the full Commission voted to affirm the National Commissioners' decision. *See* Notice of Action on Appeal at 1 (Apr. 23, 1985) (Affidavit of Henry J. Sadowski, Exh.L. (May 16, 1985)); 28 C.F.R. § 2.27(a) (1984). But whether the Commission can require the exhaustion of administrative processes in original jurisdiction cases, even when review will take more than sixty days, is a question paradigmatically "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *cf. Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975) (pretrial detainees). The statutory scheme established by the Parole Commission and Reorganization Act of 1976, Pub.L. 94–233, 90 Stat. 219 ("PCRA") (codified as amended at 18 U.S.C. §§ 4201–18 (1982)), shows that the procedure established by the Commission under 28 C.F.R. § 2.27(a) (1984) for dealing with appeals of original jurisdiction cases is invalid to the extent that it permits the Commission to take up to 119 days to review an appeal.

The PRCA authorizes the Commission to "revoke an order paroling any eligible pris-

oner." 18 U.S.C. § 4203(b)(3) (1982). Normally, a parole revocation hearing is conducted by two hearing examiners, who have the power to make a recommendation to the Regional Commissioner. A prisoner has the right to appeal the hearing examiners' recommendation to the Regional Commissioner, who must review the appeal and inform the applicant within thirty days of his decision. *See* 18 U.S.C. § 4215(a) (1982); 28 C.F.R. § 2.25(c) (1984). The prisoner then has the right to appeal the Regional Commissioner's decision to the National Appeals Board, which "must act ... within sixty days to reaffirm, modify, or reverse the decision...." 18 U.S.C. § 4215(b) 1982); *see* 28 C.F.R. § 2.26(b) (1984) ("National Appeals Board shall act within 60 days").

Some cases, however, are designated "original jurisdiction," pursuant to 28 C.F.R. § 2.17 (1984). Section 2.17(b) provides the following criteria for designating a case one of original jurisdiction:

(1) Prisoners who have committed serious crimes against the security of the Nation, e.g., espionage or aggravated subversive activity.

(2) Prisoners whose offense behavior: (i) involved an unusual degree of sophistication or planning, or (ii) was part of a large scale criminal conspiracy or a continuing criminal enterprise.

(3) Prisoners who have received national or unusual attention because of the nature of the crime, arrest, trial, or prisoner status, or because of the community status of the offender or his victim.

(4) *Long-term sentences.* Prisoners sentenced to a maximum term of forty-five years (or more) or prisoners serving life sentences.

Rastelli's case was designated one of original jurisdiction pursuant to 28 C.F.R. § 2.17(b)(2)(i) (1984), because of his "sophisticated offense behavior." Notice of Action (Dec. 4, 1984) (Rastelli Exh. 3).

The Commission has established separate procedures for dealing with original jurisdiction cases. In these cases, the Regional Commissioner "forward[s] the case with his vote ... to the National Commissioners for decision." 28 C.F.R. § 2.17(a) (1984). A special procedure also exists for appealing from the National Commissioners' decision:

Appeals [of cases "decided under the procedure specified in § 2.17"] will be reviewed at the next regularly scheduled meeting of the Commission [which is required to be held quarterly, 18 U.S.C. § 4203(a) (1982)] provided they are received thirty days in advance of such meeting. Appeals received in the officer of the Commission's National Appeals Board in Washington, D.C., less than thirty days in advance of a regularly scheduled meeting will be reviewed at the next regularly scheduled meeting thereafter.

28 C.F.R. § 2.27(a) (1984). As respondents acknowledge, this means that an appeal in an original jurisdiction case might first be reviewed as much as 119 days after it is received by the Commission. Memorandum of Law in Support of Respondents' Position That the Sixty Day Rule of 18 U.S.C. § 4215(b) Does Not Apply to the Appeal of an Original Jurisdiction Case Pursuant to 28 C.F.R. § 2.27(a) at 9 ("Sixty Day Rule Memorandum").

Rastelli argues that the sixty-day rule of 18 U.S.C. § 4215(b) (1982) should apply to appeals to the full Commission in original jurisdiction cases. Respondents reply that Congress was aware of the Commission's practice of designating certain matters as cases of original jurisdiction, and that its references to the National Appeals Board in section 4215(b) therefore manifest its decision to exclude actions taken by the full Commission from the sixty-day limit. Sixty Day Rule Memorandum at 9. *See* H.R. Conf.Rep. 838, 94th Cong.2d Sess. 22, *reprinted in* 1976 U.S.Code Cong. & Ad. News 335, 355 ("the statutory language if flexible enough to permit the Commission by regulation to reserve special categories of cases for ... decision by the Commission as a whole"). In addition, respondents note that Congress required the full Commission to meet quarterly under 18 U.S.C. § 4203(a)

(1982), and therefore could not have expected the Commission to process all original jurisdiction appeals in sixty days. *See* Sixty Day Rule Memorandum at 9.

The legislative history of the PCRA makes clear that two of Congress' primary concerns in revamping the parole system were to ensure fair and uniform treatment of prisoners, and to ensure prompt decision and review. *See* Sen.Rep. No. 369, 94th Cong., 1st Sess. 19, *reprinted in* 1976 U.S. Code Cong. & Ad.News 335, 340 ("It is essential, then, that parole has both the fact and appearance of fairness to all."); *Parole Reorganization Act: Hearings on H.R. 1598 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary*, 93d Cong., 1st Sess. 130 (statement of Maurice Sigler, Chairman of the United States Board of Parole) (goals of system should be efficient and legal review procedures) [hereinafter cited as *Hearings* ]; *id.* at 219 (statement of Norman Carlson, Director of the Bureau of Prisons) ("three key elements in a good parole system" are "promptness, the reasons for denial, and a systematic approach of assuring uniformity"); *id.* at 233 (statement of Howard Eglit, former counsel to subcommittee) (arguing reorganization was necessary because of Parole Board's intransigence in establishing efficient and uniform system).

Courts which have considered the question have uniformly upheld the Commission's authority to designate cases as matters of original jurisdiction. But each opinion upholding the Commission's promulgation of 28 C.F.R. § 2.17(b) (1984) has explicitly rested its holding on a finding that "such a referral does not implicate any constitutional or statutory rights. 'The original jurisdiction referral ... does not affect the prisoners' chances for parole but merely requires that the decision be made by the commission members rather than by hearing examiners.'" *Baker v. McCall*, 543 F.Supp. 498, 501 (S.D.N.Y.1981) (quoting *Wilden v. Fields*, 510 F.Supp. 1295, 1308 (W.D.Wis.1981)), *summarily aff'd*, 697 F.2d 287 (2d Cir.1982); *see Christopher v.*

*U.S. Board of Parole*, 589 F.2d 924, 932 (7th Cir.1978). As the Fifth Circuit noted, "[d]esignation of a case as original jurisdiction does not reflect a judgment by the Board as to the merits of an inmate's application for parole.... The purpose of the increased voting quorum requirements is not to make parole more difficult to obtain but to protect confidence in the integrity of the Parole Board...." *King v. Warden*, 551 F.2d 996, 999 (5th Cir.1977); *see Pope v. United States Parole Commission*, 647 F.2d 125, 126 (10th Cir.1981) (per curiam) (quoting *King* ).

Respondents' interpretation of their authority, however, does "implicate ... [prisoners'] statutory rights." In effect, respondents argue that they are entitled to create a class of prisoners who are excluded from the protection section 4215(b) affords against delay in the administrative process. Respondents point to an unenacted section of the Senate bill, which would have applied to original jurisdiction cases. *See* S.Rep. No. 369, 94th Cong., 1st Sess. 11 ("§ 4214. Original jurisdiction cases."). That section provided in pertinent part that "[t]he Commission, by majority vote, shall decide the appeal at its next regularly scheduled meeting...." Respondents conclude: "Congress' failure to enact this provision can only be interpreted as reflecting satisfaction with the Commission's existing practice." Sixty Day Rule Memorandum at 5–6. Instead of requiring a Commission *decision* at the *next* Commission meeting, the current regulation permits the Commission to postpone addressing an appeal if the appeal is received less than one month prior to the next scheduled meeting, and it requires only that a decision be "reviewed" at the meeting and not that a decision actually be made.

Congress' purpose in failing to enact proposed section 4214 seems obscure. The fact is that Congress left standing a time limit applicable on its face to all appeals, and its action could readily be construed, in light of Congress' repeated expressions of concern with delay in the administrative processes of the Parole Board, as a refusal

to create a general exception to that time limit.

A more fundamental response exists to this line of reasoning, however. Section 4215(b), which explicitly refers only to appeals to the National Appeals Board, provides no specific time limit for appeals to the full Commission. The applicable time limit for considering appeals to the full Commission in original jurisdiction cases would seem more properly to be determined by examining 18 U.S.C. § 4203 (1982), which deals with the "[p]owers and duties of the Commission." Section 4203 is divided into four subsections. The first provides that "[t]he Commission shall meet at least quarterly, and by majority vote shall ... promulgate rules and regulations establishing guidelines for the powers enumerated in subsection (b). . . ." 18 U.S.C. § 4203(a). Respondents have relied on this subsection in arguing that, because the Commission is only required to meet every ninety days, it cannot be required to consider original jurisdiction appeals in less time. Section 4203(a), however, is concerned with the Commission's general rulemaking power, rather than its treatment of individual inmates. The Commission's powers to grant, deny, modify, or revoke parole for "any eligible prisoner" are set out in section 4203(b). Section 4203(c)(4) contains its own explicit time limit with regard to the full Commission's exercise of powers conferred by section 4203(b). It provides in pertinent part that the Commission "may review ... any decision made pursuant to [its delegation of its power to revoke a prisoner's parole] ... except that any such decision so reviewed must be reaffirmed, modified or reversed *within thirty days* of the date the decision is rendered . . ." (emphasis added). Thus, although the PCRA only requires the Commission to meet every ninety days, the same section that sets out that ninety-day requirement also requires that, when the Commission is dealing with the case of an individual prisoner, rather than with the promulgation of rules and regulations establishing general guidelines, it must act within thirty days.

No reason exists why the Commission should not be able to render a decision in an original jurisdiction appeal within thirty days. All four National Commissioners and one of the five Regional Commissioners will already be familiar with the facts of an original jurisdiction case from having rendered the initial decision. *See* 28 C.F.R. § 2.17(a) (1984). Five of nine Commission members therefore will have reviewed the relevant information, when an appeal to the Commission is filed. No requirement exists that the Commission physically meet to consider such appeals; Commission members could communicate by telephone concerning appeals in which the time limit will run before the next actual meeting. *Compare* 18 U.S.C. § 4203(a) (1982) (Commission "shall meet at least quarterly" to promulgate rules and regulations) *with id.* § 4203(c) (Commission "by majority vote" may review parole revocation decisions). The purpose of designating a case as original jurisdiction must be to expedite consideration of sensitive cases by the full Commission, *see King*, 551 F.2d at 999, not to delay consideration of possibly meritorious appeals.

In light of the statutory context and legislative history of the applicable sections of the PCRA, 28 C.F.R. § 2.27(a) is invalid to the extent that it permits the full Commission to take more than thirty days to reaffirm, modify, or reverse a decision made pursuant to 28 C.F.R. § 2.17 (1984).

## II. *Rastelli's Appeal from the Commission's Decision.*

Rastelli challenges both the Commission's decision to revoke his parole and its decision to incarcerate him for the remainder of his sentence, a period of approximately 22–23 months, *see* Sadowski Aff. ¶ 12, rather than for the 0–9 months which the guidelines suggest, *see* 28 C.F.R. § 2.21(a) (1984). Rastelli's challenge to the Commission's decision to revoke his parole must be rejected. The Commission's decision to go above the guidelines on the present record was arbitrary and capricious, however, and must be vacated and

the case remanded for further consideration or Rastelli's release.

On April 23, 1976, Rastelli was convicted in the United States District Court for the Eastern District of New York of conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, of two substantive violations of the Hobbs Act, and of criminal restraint of trade, 15 U.S.C. § 1. He was sentenced on August 27, 1976 to ten years imprisonment, to be served consecutively to a four-year state sentence for conspiracy, criminal contempt of court, and usury. On June 15, 1977, Rastelli was released from his state sentence and began serving his federal sentence. *See* Sadowski Aff. ¶ 3.

Rastelli was afforded several parole hearings by the Commission, which decided to deny Rastelli parole and continue his incarceration until the expiration of his sentence, minus good time. On April 21, 1983, Rastelli was mandatorily released pursuant to 18 U.S.C. § 4163 (1982). A prisoner who is released pursuant to section 4163 is treated "as if released on parole until the expiration of the maximum term or terms for which he was sentenced less one hundred and eighty days." *Id.* § 4164. Thus, Rastelli was required to remain under supervision as if on parole until December 16, 1986. *See* Sadowski Aff. ¶ 5.

Rastelli refused to sign the certificate of mandatory release which set out the conditions of his release. *See* Sadowski Aff., Exh. A. Nevertheless, under Commission regulations which Rastelli does not challenge here, a mandatory releasee is bound by the conditions set forth in 28 C.F.R. § 2.40(a)(1)–(12) (1984) "regardless of any refusal by the releasee to sign the parole certificate." *Id.* § 2.40(h).

Two of the conditions by which Rastelli was bound prohibited him from "associat[ing] with persons engaged in criminal activity," *id.* § 2.40(a)(6) and "associat[ing] with persons who have a criminal record," *id.* § 2.40(a)(10). On July 6, 1984, Rastelli's Probation Officer, Victor P. Zaccheo, requested the issuance of a parole violator's warrant. *See* Sadowski Aff., Exh. B. Zaccheo stated:

Since his release . . . , Rastelli has been in contact with a number of individuals who are known to law enforcement as being involved in illegal activity. This consistent pattern of contact with these individuals has persisted throughout the parole period as confirmed by the periodic observations made by the undersigned and members of law enforcement.

Although warned repeatedly about association with individuals engaged in criminal activity and contact with those persons having a criminal record, Rastelli has elected to disregard this Condition of his release. With the exception of one occasion, Rastelli, when questioned if he had contact over the preceding month with any individual as cited above, denied any such meetings.

Sadowski Aff., Exh. B at 1. Zaccheo's letter went on to list ten instances of Rastelli's alleged association with persons having criminal records and three instances of Rastelli's alleged association with persons engaged in criminal activity. These instances stretched over the period May 24, 1983 to June 12, 1984. Zaccheo included copies of federal and state records concerning the criminal records of James Napoli, Neil Lotierzo, Edward Casaceli, Carmine Peluso, and Anthony Cusenza. *See id.* at 5–20. In follow-up letters to the Regional Commissioner on August 17, 1984, and August 21, 1984, Zaccheo enclosed additional records concerning Carmine Dagnell and Gabriel Infanti. *See* Sadowski Aff., Exhs. E & F.

Based on the information contained in the July 6 letter, the Regional Commissioner issued a warrant for Rastelli's arrest on August 13, 1984. *See* Sadowski Aff., Exh. C. The warrant contained two charges, "association with persons having a criminal record," *id.* at 1, and "association with persons involved in criminal activity," *id.* at 2. The first charge identified seven persons having criminal records with whom Rastelli allegedly associated: Casaceli (charges 1(a), 1(b), 1(c), and 1(d)), Cosenza (charges 1(b) and 1(e)), Napoli (charge 1(f)), Dagnell (charges 1(g) and 1(h)), Infanti

(charge 1(i)), Salvatore Vitale (1(i)), and Peluso (charge 1(j)). *Id.* at 1–2. The second charge stated that on February 16, 1984, an unknown individual was seen entering and leaving Rastelli's place of employment during the early morning and was seen the next day counting policy slips inside a candy store (charge 2(a)); that on February 17, 1984, Lotierzo was seen inside Rastelli's place of employment in the morning and was later observed counting policy slips with the unknown individual identified in 2(a) (charge 2(b)); and that later that day, the unidentified individual was seen entering Rastelli's place of employment several times and was ultimately seen engaged in conversation with Rastelli (charge 2(c)). *Id.* at 2.

Rastelli was arrested on August 16, 1984. *See* Sadowski Aff., Exh. D. He requested that the preliminary interview to determine whether probable cause existed be postponed until he could obtain counsel. That request was granted, and on September 6, 1984, a United States Probation Officer unconnected with the supervision of Rastelli's release conducted a preliminary interview. Sadowski Aff. ¶ 11. On September 11, 1984, the officer, Martin Morris, sent to the Regional Commissioner a summary report of the interview and recommended that the Commission find probable cause. Sadowski Aff., Exh. G. Morris noted that Rastelli requested the appearance of the law enforcement personnel who made the observations upon which the charges against him were based as adverse witnesses at his actual revocation hearing, and requested the appearance of the persons named in the warrant as voluntary witnesses. *Id.* at 1, 5, 16.

### A. The Preliminary Hearing.

Rastelli called no witnesses during the preliminary interview. *Id.* at 5. The only witnesses who appeared, therefore, were Rastelli and Zaccheo. With respect to the first charge—"association" with persons having a criminal record—Rastelli took the following positions:

*Edward Casaceli.* Rastelli claimed that "he did not know that [Casacelli] had a criminal record," that he had held no "meetings" with Casaceli, and that their contacts involved purely social visits and running household errands. *Id.* at 7.

*Anthony Cusenza.* Rastelli claimed that he was "not aware Cosenza was ever arrested," that his relationship with Cusenza was purely social, and that, because Cusenza had been on his approved visiting list when he had been incarcerated in federal institutions, he had no reason to believe that any objection existed to his seeing Cusenza. *Id.* at 8.

*Jimmy Napoli.* Rastelli admitted knowing that Napoli had a criminal record. He claimed, however, that he encountered Napoli in a public restaurant, that the meeting was wholly fortuitous, and that he only talked to Napoli for a few minutes, about purely social matters. *Id.* at 9.

*Carmine Dagnell.* Rastelli denied knowing that Dagnell had a criminal record, and stated that his relationship with Dagnell involved social visits and concerned Rastelli's being the confirmation sponsor for Dagnell's daughter. *Id.* at 10.

*Salvatore Vitale and Gabriel Infanti.* Rastelli claimed that his encounter with Vitale and Infanti at the Fresh Pond Diner was fortuitous. He stated that he knew Vitale and also knew that Vitale had no arrest record, and that he had never met Infanti before and was thus unaware whether Infanti had a criminal record. *Id.* at 10–11.

*Carmine Peluso.* Rastelli stated that he had known Peluso for a long time and was unaware of his arrest record. Furthermore, Rastelli stated that he did not remember seeing Peluso at the Fresh Pond Diner. *Id.* at 11–12.

Rastelli also denied the allegations contained in the second charge. At first, Rastelli stated he did not know who "Joe LNU" (the unidentified individual) was. When Zaccheo appeared at the hearing, he showed Rastelli a photograph of "Joe LNU." Rastelli then identified him as

Rocky Greco, the landlord of the building in which Rastelli worked, and claimed he had discussed matters relating to the building with him. *Id.* at 13–14. He indicated that he knew Lotierzo as the owner of a luncheonette that supplied his employer with snacks, but stated that he was unaware that Lotierzo had a criminal record. *Id.* at 12–13. Rastelli's counsel stated that he had interviewed Lotierzo, and that Lotierzo had been arrested on one occasion many years previously and the charges had been dismissed. *Id.* at 13.

The hearing officer showed Rastelli and his attorney Zaccheo's July 6 letter requesting the warrant (Sadowski Aff., Exh. B), and summarized the arrest records of the various persons named. Neither Rastelli nor his lawyer asked to see the underlying documents. *Id.* at 14.

Based on the interview and his separate interview of Zaccheo, Morris found probable cause. He based his finding "primarily on the fact that the associations listed in the warrant application are cumulative in nature. There appears to be a continuous history of association.... As well, there were a significant number of individuals with whom the parolee allegedly associated during this time.... Evidently, as indicated in the letter requesting the violator's warrant, Rastelli was warned repeatedly about such associations and, with one exception, repeatedly denied even casual associations." *Id.* at 16.

On October 3, 1984, the Regional Commissioner reviewed Morris' report and concluded that probable cause existed to hold Rastelli for a revocation hearing. Rastelli was advised of this determination on October 12, 1984. Sadowski Aff. ¶ 11 & Exh. H.

## B. *The Final Revocation Hearing.*

Rastelli's final revocation hearing was held at the MCC on November 20, 1984, before Hearing Examiners Wittenstein and Lindsay. The hearing consisted of three phases. First, Rastelli and the examiners discussed the charges against him. Rastelli's counsel stated that Rastelli "admit[ted]

contact with [the people named in the two charges]," but stated that the contact did not, as a matter of law, constitute "association." Transcript of Parole Revocation Hearing at 4. [hereinafter cited as "Transcript"; all citations are to the version provided by respondents]. Rastelli also claimed with regard to all the persons named but Napoli, whom he knew from Lewisburg, that he was unaware of their criminal records. *Id.* at 5–6, 7–8. As for Napoli, Rastelli claimed he met Napoli by chance when he stopped at a restaurant on his way to visit Carmine Dagnell. *Id.* at 6. While Rastelli was there, Napoli entered the restaurant (where he apparently worked, *id.* at 9), and Rastelli and Napoli sat together for a while talking before Rastelli left to visit Dagnell. *Id.* at 7.

Rastelli denied having any knowledge of the illegal gambling activity alleged in charge 2. *Id.* at 10. His counsel pointed out that the actual illegal activity was not alleged to have occurred at Rastelli's workplace, but at a candy store nearby. *Id.* at 10–11. Rastelli stated that his conversation with Greco concerned improvements to the building in which Rastelli worked. *Id.* at 12–13.

Probation Officer Zaccheo presented the government's case. He disputed Rastelli's statement that he was unaware of the arrest records of the persons named in the warrant, suggesting that Rastelli must have known about their prior records because he claimed to have grown up with them. *Id.* at 15. He also stated that "I just think that the Commission should consider the fact that there is a clear pattern over here, that he was involved with individuals who have arrest records for gambling and so on." *Id.* In response to the question as to how many of the individuals named had ever been convicted, Zaccheo stated that "I believe there is [*sic*] just two individuals that have convictions. That would be Mr. Infanti and Mr. Napoli." *Id.* In reviewing the rap sheets on cross-examination, Zaccheo also pointed to a conviction of Peluso. *Id.* at 19. Zaccheo also stated that Rastelli's adjustment on parole was

"satisfactory," other than with regard to the charges in the warrant. *Id.* at 15–16. Zaccheo then called three witnesses.

*Patrick Marshall.* Marshall, an FBI agent, testified that the FBI had observed Rastelli on two occasions at the Fresh Pond Diner, once with Vitale and Infanti and once with Peluso. The FBI had apparently conducted somewhere between five and twelve surveillances of Rastelli, *id.* at 29, because it had received information that he was meeting with various members of the Bonanno organized crime family, *id.* at 30. Marshall stated that the FBI believed Vitale to be a soldier, and Infanti a captain, in the Bonanno family. Marshall also testified that Peluso was believed to be an associate of Joseph Messina, the alleged acting boss of the Bonanno family, and that Rastelli is believed to be the boss. *Id.* at 22–23. Under cross-examination, Marshall stated that he had not personally performed the surveillance that resulted in charges 1(i) and 1(j). *Id.* at 24. Rastelli's counsel asked to see the actual reports, and Zaccheo objected on the grounds of relevancy. Examiner Wittenstein upheld the objection, on his own suggestion that "those reports are involved in other cases and that [their disclosure] would harm those other cases ..." *Id.* at 25 (ellipses in original). Marshall then stated that the identification of Peluso was made primarily on the basis of an automobile license plate, and that no photographs had been taken. *Id.* at 27–28.

*John Clark.* Clark testified that he was the New York City Police Department analyst for the Bonanno family, that his team at the Police Department had conducted surveillance of Rastelli on between thirty and forty occasions, *id.* at 34, and that it had observed a number of encounters between Rastelli and Casaceli, and Cusenza. He stated that Cusenza was known to be associated with the Bonanno family. *Id.* at 31–32. On cross-examination, Clark stated that he did not know that Casaceli was licensed to own a bar by the State Liquor Authority, *id.* at 36, and that he did not know whether Casaceli had ever been convicted of a crime, *id.* at 37.

*Armin Ali.* Ali was the United States Probation Officer who had conducted the surveillance which formed the basis for charge 2. Because the Hearing Examiners concluded that "[i]t did not appear to the panel that sufficient information existed to make findings to charges (a), (b) and (c) [apparently of charge 2]," Sadowski Aff., Exh. I at 4, his testimony need not be discussed.

Rastelli called four of the persons named in the warrant as witnesses. The examiners repeatedly urged Rastelli's counsel to make his examination "as expeditious" as possible. *See, e.g.,* Transcript at 49–50; *id.* at 3 ("I don't want this to be a four-hour hearing.... [W]e'll ask the witnesses to come say what they have to say in as short a time as possible.")

*Edward Casaceli.* Casaceli testified that he was the licensee of a bar, that he was a friend of Rastelli and occasionally visited his home, that he never discussed illegal activity of any kind with him, and that he had never told Rastelli of his arrest, which occurred at a time when he was not seeing that much of Rastelli. *Id.* at 51–52. The only questions the examiners asked Casaceli were whether he knew that Rastelli "had had problems with the law," and whether the Silver Star which Casaceli wore was his own. *Id.* at 52.

*Carmine Dagnell.* Dagnell stated that he had known Rastelli for approximately thirty years and that Rastelli was the godfather to his daughter. *Id.* at 54. He also testified that he had never told Rastelli about his arrests some thirty years before. *Id.* at 55. Dagnell described the circumstances of his arrest for gambling: "It was for gambling, street game.... I was locked up with maybe twenty or thirty other people from the street. We paid our fine and that was it.... A five dollar fine." *Id.* at 56. Dagnell admitted that he knew of Rastelli's criminal record. *Id.* at 55–56.

*Anthony Cusenza.* Cusenza admitted having been arrested forty years before for bookmaking, but stated that he had been

given permission to visit Rastelli when Rastelli had been incarcerated at Lewisburg. *Id.* at 59, 60. After the examiners had finished questioning Cusenza, Officer Zaccheo asked him a series of questions about whether he knew Aniello Dellacroce, who Zaccheo characterized as "the underboss of the Gambino family." When Examiner Lindsay asked Zaccheo what point he was trying to make, Zaccheo replied, "I'm trying to possibly draw an inference here as to Mr. Cusenza's acquaintances in the community," *id.* at 62, a point without obvious salience to a charge that Rastelli violated his parole by associating with Cusenza because Cusenza had a criminal record.

*Neil Lotierzo.* Lotierzo testified with regard to charge 2. He stated that he owned a store near the place where Rastelli worked, that he was not involved in the policy business, and that he sometimes employed Rocky Greco to deliver items, suggesting that the slips of paper Ali had seen were bills and receipts. *Id.* at 65. He also testified that he had been arrested once, twenty years ago, but that his case had been dismissed. *Id.* at 66.

After hearing a short closing statement from Rastelli's counsel and deliberating, the examiners announced their decision on the record:

Alright, (UI) what we're going to first recommend, Mr. Rastelli, is that the case again be referred to the regional commissioner to consider for original jurisdiction consideration. We're going to recommend that your mandatory release be revoked,.... [and] that you are continued to the expiration of your mandatory release. The reasoning of the examiners are numerous associations. Okay, And let me also say this. We're making a finding in charge number one, all of the A, B, C for charge number one, not in charge number two, the numerous associations, the continued violation of your parole in that mandatory release in that manner, the associations, some of the people reportedly organized crime connected. And it is also noted that you previously violated parole in 1948, I believe it was, for association. We're noting that also for the record.

*Id.* at 71. Rastelli then asked the examiners about their recommendation that he serve the rest of his sentence:

RASTELLI: You said something about zero to nine months?

WITTENSTEIN: Those are your guidelines.

RASTELLI: Oh.

WITTENSTEIN: Okay. We're going above your guidelines for the reasons I gave.

RASTELLI: Alright.

NEWMAN: So that I understand it clearly, are you saying you made a finding as to charge one [on] all the subdivisions and you did not find as to charge two?

WITTENSTEIN: Correct.

*Id.* at 72.

C. *Proceedings Within the Commission.*

After the hearing, on November 20, 1984, the examiners prepared a hearing summary. *See* Sadowski Aff., Exh. I. The findings regarding Rastelli's violation differed significantly from those announced orally at the hearing. At the hearing, the panel had made a finding as to all ten subdivisions of charge one, but in the summary, "[t]he panel [found] as a fact that subject violated mandatory release as indicated below: Charge No. 1(f), 1(g), 1(h), 1(i), and 1(j)." *Id.*, Exh. I at 4. The examiners gave the factual basis as Rastelli's "admission to the hearing panel and the criminal records of the individuals cited in the sections of Charge No. 1 as listed above." *Id.* The examiners also provided an explanation of its recommendation that Rastelli be continued to expiration:

The applicable guideline range is 0–9 months. The panel made findings on five associations with individuals that had sustained convictions. The panel did not make findings for those individuals who had been arrested but did not sustain convictions. It did not appear to the panel that sufficient information existed

to make findings to charges [2](a), (b) and (c). The guidelines are 0–9 months for the technical violations of parole. However, the panel will make a recommendation for a continue to expiration which will cause this individual to serve about 23 months.... Reasons for an above-the-guideline recommendation are the numerous associations [for] which the panel recommends findings, and noting that the individuals with whom Rastelli met on June 5, 1984 [Vitale and Infanti] are considered Bonanno LCN family members, thus indicating the possibility that Rastelli was conducting organized crime business when he had this meeting. It is also noted that the meeting[s] of June 5 and June 12, 1984 were apparently previously set up in that the other participants arrived before Rastelli, who then met them at the restaurants. Additionally, the panel notes that in 1946 this man had a violation of parole in that he had consorted with a codefendant in a 1940 conviction, and this establishes a repeat of association with a person having a criminal record over an extended period of time, thus indicating a likelihood for Rastelli to continue this type of conduct once released again.

The panel will further recommend that this case be considered original jurisdiction in noting that the case had previously been original jurisdiction due to a large-scale criminal conspiracy Rastelli had been involved in, or a continuing criminal enterprise, and noting that since this man is considered head of an organized crime family in New York City, there is a certain amount of notoriety involved in the case.

*Id.* at 4–5.

Rastelli's file was reviewed in the Regional Office by both the Administrative Hearing Examiner and the Regional Commissioner. Both agreed with all the panel's recommendations. Sadowski Aff. ¶ 13. The Regional Commissioner sent the National Commissioners a memorandum on December 5, 1984, referring Rastelli's case as one of original jurisdiction and setting forth his vote. *See* Sadowski Aff., Exh. J.

The Regional Commissioner stated that Rastelli's "disregard to instructions to avoid former associates known to be involved in past criminal activities is a flagrant violation of his conditions of parole.... [Rastelli] had been seen associated with known ex-felons with criminal records." *Id.,* Exh. J at 1. The Regional Commissioner stated that the evidence on which the examiners had relied consisted of the testimony of both the adverse and the friendly witnesses and the argument of Rastelli's counsel. He made no mention of Zaccheo's July 6 letter requesting a warrant, the sole source for the claim that Rastelli had been warned repeatedly about associating.

The Regional Commissioner also reformulated the reasons to be given for taking Rastelli above his guidelines:

Your parole violation has been classified as administrative. You have been in confinement as a result of your violation behavior for a total of 3 months. Reparole guidelines indicate a range of 0–9 months to be served before release. After review of all relevant factors and information presented, a decision above the guidelines appears warranted because you were involved in at least 5 associations with persons having criminal records from April 28, 1984 to June 12, 1984. Thus, indicating a pattern of M/R violations. Additionally, you reportedly met with individuals associated with an organized crime family that you are reportedly associated with. Also, you committed a parole violation in 1946 for consorting with a co-defendant in a 1940 conviction and your continued associations in 1984 indicates a repetitious violation behavior.

*Id.,* Exh. J at 2.

The National Commissioners then reviewed Rastelli's case. *See* 28 C.F.R. § 2.17(a) (1984). Three Commissioners agreed with the panel recommendations, as communicated to them by Regional Commissioner Lopez, thus making it the effec-

tive decision of the Commission. Sadowski Aff. ¶ 14.

This decision was communicated to Rastelli in a Notice of Action dated January 16, 1985. As explained in the Notice of Action, the Commission made findings of fact with respect to charges 1(f), 1(g), 1(h), and 1(j). The basis for these findings was Rastelli's "admission to the hearing panel and the criminal records of the individuals cited in the sections of Charge # 1 as listed above." Sadowski Aff., Exh. K at 2. In addition, the Commission explained the decision to take Rastelli over his guidelines "because of the following aggravating factors:"

> After repeated warnings from your supervising probation officer not to associate with persons having a criminal record, you did so on at least five occasions, from April 28, 1984 to June 12, 1984, showing a pattern of flagrant disregard for the conditions of your release. The manner in which you violated the conditions of your release indicates that is [sic] is likely that you would again violate release conditions if you were paroled at this time.

*Id.* at 2.

On or about February 1, 1985, Rastelli sent the Commission an executed administrative appeal form. The full Commission considered Rastelli's appeal at its April 22, 1985 meeting and "voted unanimously to affirm the previous decisions rendered in his case." Sadowski Aff. ¶ 17. On April 23, 1985, a Notice of Action setting forth the Commission's decision and reasons was issued. *See* Sadowski Aff., Exh. L.

The Commission responded to Rastelli's claims regarding warnings not to associate both by pointing out that the mandatory release certificate contained the condition, which was binding on Rastelli even if he refused to sign it, *id.*, Exh. L at 2, and by referring specifically to Zaccheo's letter requesting a warrant, *id.*, which had stated that Rastelli had been "warned repeatedly" not to associate, *id.*, Exh. B at 1.

The Commission also stated that the record indicated that Dagnell, Peluso, and Napoli had records of convictions, and that

Rastelli had admitted knowing about Napoli's record. With regard to the standard it had applied, the Commission explained

> When there is a dispute in the accuracy of the information presented, the Commission must resolve this dispute by the preponderance of the evidence standard. The normal indicants of reliability are that the report is specific as to the behavior alleged to have taken place and that the allegation is corraborated [sic] by established facts and the source of the allegation appears credible. Applying this standard, the Commission found in your case that you were guilty of association with persons having a criminal record and that a decision above the guidelines was warranted. Those reasons were specified in your Notice of Action dated January 16, 1985 and explained the factors which distinguish your case from the "typical" cases for which the guidelines are set.

*Id.*, Exh. L at 2.

### D. *The Legitimacy of the Commission's Actions.*

In *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), the Supreme Court held that the revocation of parole "inflicts a 'grievous loss' on the parolee" and therefore "calls for some orderly process, however informal." One of the "minimum requirements of due process" in any parole revocation proceeding is the provision to the parolee of "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *Id.* at 489, 92 S.Ct. at 2604. Because the Court recognized that a parolee's due process interest in avoiding wrongful revocation is weightier than the "mere anticipation or hope of freedom" enjoyed by confined convicts, *id.* at 482 n. 8, 92 S.Ct. at 2601 n. 8 (quoting *United States ex rel. Bey v. Connecticut Board of Parole,* 443 F.2d 1079, 1086 (2d Cir.), *vacated as moot,* 404 U.S. 879, 92 S.Ct. 196, 30 L.Ed.2d 159 (1971)), the due process protections afforded in initial parole hearings or internal classification proceedings apply *a*

*fortiori* to revocation cases. *See Drayton v. McCall,* 584 F.2d 1208, 1219 (2d Cir. 1978).

■ As construed by the Second Circuit, the required statement "must provide the inmate with the grounds for a decision ... and the essential facts upon which the [Commission] relied." *Zurak v. Regan,* 550 F.2d 86, 95 (2d Cir.), *cert. denied,* 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). But the statement is not required only to lead the decisionmaker to think about and rely upon the relevant factors, or to ensure that the inmate understands the grounds for decision. It is also meant to "enable the reviewing body to determine whether parole has been [revoked] for an impermissible reason, or indeed, for no reason at all." *Haymes v. Regan,* 525 F.2d 540, 544 (2d Cir.1975).

■ In reviewing the Commission's decision to revoke parole, "a court may not substitute its own judgment for that of the commission, but may consider only whether there is a rational basis for the commission's decision." *Bialkin v. Baer,* 719 F.2d 590, 593 (2d Cir.1983) (citations omitted). "The Commission's determination may only be challenged if it is 'arbitrary [and] capricious or an abuse of discretion.'" *Baker,* 543 F.Supp. at 499 (quoting *Dye v. United States Parole Commission,* 558 F.2d 1376, 1378 (10th Cir.1977)).

The Second Circuit has also made clear that the review is to be performed on the decision announced to the parolee. *See, e.g., Baker,* 543 F.Supp. at 500 (to justify parole decision outside guidelines *"the reasons given in the notice of action"* must be sufficient) (emphasis added). Thus, in reviewing the Commission's decision to revoke Rastelli's parole and continue him to expiration, the court may only consider the findings of fact provided and reasons given in the two Notices of Action dated January 16, 1985, and April 23, 1985 (Sadowski Aff., Exhs. K & L). Respondents may not rely on facts or reasons not contained in those two documents to justify their decision.

1. *The Decision To Revoke Rastelli's Parole.*

■ Whether the Commission's finding that Rastelli violated the conditions of his mandatory release rests on a "rational basis" depends on the answer to two subsidiary questions: do the people named in charges 1(f), 1(g), 1(h), and 1(j) have criminal records and did Rastelli "associate" with them?

As defined by the Second Circuit, the term "criminal record" is "construed to refer to conviction for crime." *Birzon v. King,* 469 F.2d 1241, 1243 (2d Cir.1972); *see United States v. Albanese,* 554 F.2d 543, 546 n. 5 (2d Cir.1977). In *Albanese,* the Court explicitly upheld the Commission's right to forbid association with persons having a criminal record as a condition of release. *Id.* at 546.

The charges on which the Commission made findings concern three persons: Jimmy Napoli; Carmine Dagnell; and Carmine Peluso. Napoli clearly has a criminal record. *See* Sadowski Aff., Exh. B at 5–11 (rap sheets listing numerous felony convictions). Moreover, Rastelli and Napoli were acquainted with each other at F.C.I. Lewisburg, where they were both serving federal sentences.

No substantial evidence exists for the Commission's finding that Dagnell has a criminal record within the meaning of *Birzon* and *Albanese.* Respondents admit that Dagnell's arrest record "does not show a conviction," but argue that Dagnell admitted in his testimony at the revocation hearing that he had been convicted. The rap sheet submitted to the Commission by Officer Zaccheo, *see* Sadowski Aff., Exh. E at 2–8, indicates only one charge involving gambling, but the rap sheet indicates that on January 27, 1961, Dagnell was "[a]cquitted." *Id.* at 2. Dagnell, a retired truck driver with a heart condition, occasionally appeared confused or intimidated by the questioning, *see* Transcript at 55–56, and his statement that he paid a five dollar fine after being arrested in a street sweep of an illegal gambling game could have reflected payment of a noncriminal summons, espe-

cially since the judgment of acquittal was entered almost two weeks after the arrest. It seems unreasonable to view the five dollars as having anything to do with the final judgment in the case, or as proof of a criminal record, when the correct answer might be obtainable from court files.

Carmine Peluso's rap sheet indicates one criminal conviction, for petit larceny, a class A misdemeanor, on May 20, 1966, for which he received a six-month, suspended sentence. *See* Sadowski Aff., Exh. B at 16. Rastelli argues that, because Peluso was convicted only once, for a misdemeanor, roughly twenty years ago, and was not imprisoned for that conviction, the Commission should not have considered that conviction. No case of which the court is aware has ever addressed whether the phrase "persons who have a criminal record," as used in 28 C.F.R. § 2.40(a)(10) (1984) encompasses misdemeanor convictions. The Regional Commissioner for the Northeast Region, Daniel R. Lopez, apparently based his recommendation to the National Commissioners on Rastelli's having been "seen associated with known ex-felons with criminal records," *see* Sadowski Exh. J at 1, of whom Peluso is not one. *Albanese* stated that "[b]ecause permitting a probationer 'association with hardened or veteran criminals' would defeat probation's underlying purpose, it has for many years been one of the standard conditions of probation that such association is prohibited." 554 F.2d at 546 (quoting *United States v. Murray*, 275 U.S. 347, 357, 48 S.Ct. 146, 149, 72 L.Ed. 309 (1928)). That rationale is not fully applicable here, since one misdemeanor conviction fails to indicate a hardened or veteran criminal.

Nevertheless, the full Commission, of which Lopez is a member, explicitly stated that, in its view, Peluso "has a prior conviction record." Sadowski Aff., Exh. L at 2. "Deference to the [C]ommission's interpretation of its own regulations is required unless that interpretation is shown to be unreasonable." *Bialkin*, 719 F.2d at 593. An interpretation of "criminal record" that includes "conviction for a mis-

demeanor" cannot be said to be unreasonable. *Cf. Argersinger v. Hamlin*, 407 U.S. 25, 47–48, 92 S.Ct. 2006, 2017–2018, 32 L.Ed.2d 530 (1972) (Powell, J., concurring) (effect of "criminal record" of misdemeanor conviction is sufficiently serious to require provision of counsel).

In the context of parole, the term "associate" has been defined to mean:

"something more than merely a fleeting or casual acquaintance.... This is reflected and supported by the general definition given to "associate" in Webster's Third New International Dictionary which defines "associate" as follows:

To join often, in a loose relationship as a partner, fellow worker, colleague, friend, companion or ally.

In *Arciniega v. Freeman*, 404 U.S. 4 [92 S.Ct. 22, 30 L.Ed.2d 126] ... (1971), the Supreme Court was called upon to interpret the term "associate" as used in a federal parole condition. The Court held that the condition was not "intended to apply to incidental contacts between ex-convicts in the course of work on a legitimate job for a common employer." Hence, it appears that the term has been interpreted in accordance with the common understanding that is attached to it.

*Birzon*, 469 F.2d at 1243 & n. 3.

In this case, Rastelli claims that his encounters with Napoli and Peluso do not constitute "association." First, with regard to Peluso, he claims that he was unaware of Peluso's conviction and that scienter is required to violate a condition of parole. Hearing Memorandum in Support of Rastelli's Habeas Corpus Petition at 14–15 [hereinafter cited as Petitioner's Memorandum]. Second, he argues, with respect to both Napoli and Peluso, that one meeting cannot constitute an "association." Petitioner's Memorandum at 19, 20. Third, he argues that, because his encounters with Napoli and Peluso were fortuitous and brief, they were not "associations." *Id.*; *see* Petitioner's Reply Memorandum of Law at 6–7.

*Birzon* left open the question whether a parolee must be aware of the criminal

record of someone with whom he associates, because the issue was raised there in the context of a challenge for vagueness. But the Court noted that "the Government indicates that the condition is required to require scienter." 469 F.2d at 1243 n. 5. In *Albanese*, the court approved a revocation of probation for failure to "associate only with law-abiding persons," 554 F.2d at 545, when the defendant was found "continually and consistently, over a period of years, [to have] associated on a more than casual basis with a large number of convicted criminals.... The district court found that these associations represented a 'calculated choice' on the part of appellant...." *Id.* at 546. In *Frank v. United States*, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969), however, Chief Justice Warren and Justice Douglas dissented from the imposition of a three-year probation period on a defendant convicted of criminal contempt without a jury trial precisely because they believed that no scienter would later be required to revoke his probation: "a court can order a defendant to associate only with 'law-abiding' persons, thereby significantly limiting his freedom of association, for this condition, *which does not limit revocation of probation to 'knowing association,'* forces him to choose his acquaintances at his peril." *Id.* at 154, 89 S.Ct. at 1508 (emphasis added); *see also United States v. Bonanno*, 452 F.Supp. 743, 756 n. 18 (N.D.Cal.1978) ("probationer can be held strictly accountable" for violations of association condition), *summarily aff'd*, 595 F.2d 1229 (9th Cir. 1979).

Respondents here do not argue that scienter is unnecessary. Rather, they claim that Rastelli was in fact aware of Peluso's conviction. *See* Respondents' Memorandum at 14–15. Peluso's conviction occurred eighteen years ago. According to an affidavit Peluso filed in support of Rastelli's petition, he has known Rastelli "for about 15–18 years...." Affidavit of Carmine Peluso ¶ 3 (Mar. 2, 1985). Thus, Rastelli possibly knew Peluso around the time of Peluso's conviction. Moreover, because the two men have known each other for such a long time, Rastelli may at some point have become aware of Peluso's conviction. Given the limited nature of review permitted by *Bialkin,* one cannot say that the Commission's conclusion that Rastelli was aware of Peluso's conviction is unreasonable.

Respondents correctly note that "[j]udicial construction of the terms 'associate' and 'association' has focused on the type of contacts rather than on the number of the contacts." Respondents' Memorandum at 11. In *Bonanno,* for example, Chief Judge Peckham found that one three-hour dinner constituted an "association," even though the probationers suggested that they were merely attending the same business dinner as the two men with whom they were accused of associating. 452 F.Supp. at 758. Here, Napoli and Peluso were undeniably more than "fleeting" or "casual" acquaintances of Rastelli; he admitted having known both of them for many years. Rastelli's counsel admitted at the revocation hearing that Napoli in fact worked at the lounge where Rastelli encountered him, *see* Transcript at 9, and Rastelli apparently knew that Napoli was somehow connected to the establishment. *See id.* at 7. Thus, the Commission could reasonably conclude that Rastelli entered the lounge with the intention of seeing Napoli, despite Rastelli's claim that he merely stopped there for a snack. Moreover, despite Rastelli's claim now that "[n]obody testified that the two men were seen talking," Petitioner's Memorandum at 20 (emphasis omitted), Rastelli himself admitted, both to Officer Zaccheo and at the revocation hearing, that he had had a conversation with Napoli. *See* Affidavit of Victor P. Zaccheo ¶ 15 (May 17, 1985); Transcript at 7. The Commission was not unreasonable in concluding that the approximately one-hour period which Rastelli and Napoli both spent inside an apparently private social club, *see* Transcript at 21, constituted an association.

The question of Rastelli's encounter with Peluso is more difficult. The sole evidentiary basis on which the Commission rested its finding that Rastelli associated with Pe-

luso on June 12, 1984, is Rastelli's "admission to the hearing panel...." Sadowski Aff., Exh. K at 2. But at his preliminary interview, Rastelli claimed not to remember having encountered Peluso on that date. *See* Sadowski Aff., Exh. G at 11–12. Nor did Rastelli make any specific admission of encountering Peluso at his final hearing.

▪ The Commission may well have also considered, in making its finding with regard to charge 1(j), the surveillance conducted by the FBI. At the revocation hearing, Rastelli sought the evidentiary basis for the warrant's claim that he had been seen "engaged in conversation with Peluso [for approximately one-half hour]." Sadowski Aff., Exh. C at 2. Rastelli's counsel had asked explicitly at the preliminary interview that the actual agent involved in the surveillance be present at the final hearing. Officer Zaccheo instead called an FBI agent who had not participated in the Bureau's claimed observation of Rastelli and Peluso. Agent Marshall testified that the identification of Peluso was made partially on the basis of tracing a license plate and partially on the basis of a physical description of Peluso as "48 to 50 years old, salt and pepper hair, average build." No photographs were taken of the surveillance. Transcript at 27–28. The hearing examiners refused to give Rastelli or his counsel access to the actual surveillance report. "[A] refusal to provide the parolee with access to the actual documents employed against him, without a showing of good cause for such secrecy, is impermissible." *United States ex rel. Carson v. Taylor,* 540 F.2d 1156, 1161 (2d Cir.1976); *see Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604. A strong presumption exists in favor of disclosure of relevant evidence, which the Commission bears the burden of overcoming.

▪ Respondents argue that the hearing examiners made a specific finding of good cause sufficient to justify nondisclosure. Respondents' Memorandum at 23–24. The alleged finding was that "an ongoing investigation of a confidential nature" would be impeded by releasing the surveillance re-

port. Respondents' Memorandum at 24 n.*. This "finding" was prompted, however, not by an objection from Agent Marshall who was the person presumably most familiar with the FBI's investigative needs, but by Probation Officer Zaccheo who objected on the grounds of relevance. Transcript at 25. Moreover, no reason for blanket nondisclosure of the surveillance report has been provided. The examiners might easily have been able to examine the report and redact matter irrelevant to Rastelli's claim at the revocation hearing. *Cf. Birzon,* 469 F.2d at 1245 (parole board is "required to disclose to the parolee so much of the substance of the informants' accusatory statements as it finds consistent with their safety"). The Commission's failure to provide Rastelli with the "substance" of the surveillance report violated his right to due process. *Id.* at 1244; *see Carson,* 540 F.2d at 1161–63. The Commission's finding on charge 1(j) must therefore be rejected on the present record.

Finally, although the Commission only found violations with respect to charges 1(f), 1(g), 1(h), and 1(j), respondents argue that this court should nevertheless consider charge 1(i), which involved an alleged meeting at the Fresh Pond Diner with Salvatore Vitale and Gabriel Infante. They claim that it "was inadvertedly [*sic*] omitted from the notice of action of January 16, 1985 [due to] merely a clerical error." Sadowski Aff. ¶ 15; *see* Respondents' Memorandum at 6 n.*. Respondents' claim is made in an affidavit subscribed to by Henry J. Sadowski, Esq., the Regional Counsel for the Northeast Region. None of the Commissioners responsible for the two Notices of Action has made this claim. In fact, on appeal, the Commission specifically stated that it believed that Dagnell, Peluso, and Napoli had prior conviction records. It never mentioned either Salvatore Vitale or Gabrel Infanti.

▪ Rather than it being a "clerical error" to omit this finding, the Commission would have made a substantive error by including it. Salvatore Vitale had never been arrested, let alone convicted, at the

time of the alleged meeting. Affidavit of Salvatore Vitale ¶ 5 (Mar. 2, 1985). Thus, any claim of association based on an encounter with him should be rejected out of hand. The allegation that he is a soldier in the Bonanno family is legally insufficient to justify a finding that he has a criminal record. Moreover, since the evidentiary basis for the Commission's findings was Rastelli's "admissions," no basis existed for a finding based on "association" with Gabriel Infanti (who does have a felony conviction; see Sadowski Aff., Exh. E at 9; Exh. F at 2). Rastelli claimed that he had never met Infanti before. In short, since Rastelli's association with Vitale was permissible, and his encounter with Infanti was an "incidental" or "fleeting" contact, the Commission had insufficient evidence to find a violation of his parole on this basis. *Arciniega v. Freeman*, 404 U.S. 4, 4, 92 S.Ct. 22, 22, 30 L.Ed.2d 126 (1971) (per curiam); *Birzon*, 469 F.2d at 1243.

In conclusion, the Commission's finding as to charge 1(f) was reasonable, and therefore must be sustained, but its findings on charges 1(g), 1(h), and 1(j) must be rejected.

### 2. *The Decision To Continue Rastelli To Expiration.*

"[T]he finding of violations ... is only a first step. The second, and more crucial, determination is whether the violations warrant returning the parolee to prison. Due process must attend both stages of the inquiry." *United States ex rel. Carson v. Taylor*, 403 F.Supp. 747, 751 (S.D.N.Y. 1975), *aff'd*, 540 F.2d 1156 (2d Cir.1976); *see Toomey v. Young*, 449 F.Supp. 336, 338 (D.Conn.1978) (Newman, J.), *aff'd per curiam*, 589 F.2d 123 (2d Cir.1979). Rastelli has already served over nine months, the maximum time provided in the guidelines for reparole in his case. *See* Sadowski Aff., Exh. K at 2. The question arises, therefore, whether the Commission's decision to continue him to expiration was arbitrary, capricious, or an abuse of discretion.

■ The Commission is entitled to depart from its reparole guidelines for "good cause." *Bialkin*, 719 F.2d at 594; 18

U.S.C. § 4206(c) (1982). In its formal decision, the Commission pointed to three "aggravating factors" that justified more than doubling the recommended period of incarceration: "repeated warnings" not to associate; a "pattern of flagrant disregard"; and "the manner in which [Rastelli] violated the conditions." *See* Sadowski Aff., Exh. K at 2. None of these factors, however, provides a sufficient justification for the decision in this case.

■ The sole source for the finding that Rastelli received repeated warnings not to associate was Probation Officer Zaccheo's July 6 letter requesting a warrant, *see* Sadowski Aff., Exh. L at 2, a source which was not identified in the original Notice of Action. The hearing examiners asked Zaccheo no questions concerning whether he gave any warnings to Rastelli. Nor did they give any indication at the hearing that they intended to rely on Zaccheo's letter. Thus, Rastelli was never on notice that he should contest the allegation in the letter (rather than simply respond to the charges in the warrant) or that he should cross-examine Zaccheo concerning Zaccheo's supervision of him. In *Carson*, the Second Circuit noted that the friction between a parole officer and a parolee may lead the officer to distort the evidence against a parolee whose revocation he seeks. 540 F.2d at 1161–62. Such a loss of objectivity may have occurred in this case. In an affidavit subscribed to after the Commission had decided not to make findings against Rastelli on charges 1(a) through (e), 1(i), and 2, Zaccheo continued to maintain that these charges showed Rastelli had violated his parole. Zaccheo Aff. ¶ ¶ 7 (mentioning Cusenza), 8 (mentioning Rocky Greco), 9 (mentioning Greco and Lotierzo), and 16 (mentioning Infante and Vitale). By contrast, at the hearing Zaccheo stated that he believed that "just two individuals," Infanti and Napoli, had convictions, Transcript at 15, although he later included Peluso on that list as well, *id.* at 19. Thus, Zaccheo implicitly admitted seeking a warrant against Rastelli based on charges of associating with people with criminal

records, even though those people did not have "criminal records" within the meaning of 28 C.F.R. § 2.40(a)(10) (1984). Zaccheo's behavior may reflect an "excess measure of indifference, unfairness, arbitrariness, and unexplained punitiveness...." *Carson*, 403 F.Supp. at 751.

The second aggravating factor is equally unsubstantial, for in light of the analysis in the preceding section, no "pattern" of violations exists. The examiners made their initial recommendation that Rastelli be continued to expiration at a time when they apparently intended to find against Rastelli on all ten of the associations set out in charge 1. *See* Transcript at 71–72. If Rastelli had in fact legitimately been found to have engaged in all the associations charged, then this factor would have a substantial basis. But the examiners only proposed recommended findings with respect to five, *see* Sadowski Aff., Exh. I at 4; the Commission only issued a decision with respect to four, *id.* Exh. K at 2; and this court has rejected two of the remaining four charges as legally insufficient (involving Dagnell) and one because of a violation of Rastelli's due process rights (Peluso), *supra* section II.D.1. Therefore, only one, validly established, violation remains against Rastelli, over a period of fourteen months, despite roughly fifty surveillance operations by probation officers, the New York City Police Department, and the FBI. The one association with Napoli may justify a finding that Rastelli violated the conditions of his release. It might even justify revoking his parole for the period set out in 28 C.F.R. § 2.21(a) (1984). But it cannot alone justify incarcerating him for two additional years.

Finally, the third factor, "the manner in which [Rastelli] violated the conditions of [his] release," is the kind of "formal agency jargon.... [t]hat cannot be sustained." *Carson*, 403 F.Supp. at 756. Courts that have sustained Commission decisions to take prisoners over the guidelines have pointed to the specificity of the reasons given in the notices of action. *See, e.g., Alessi v. Quinlan*, 711 F.2d 497, 500 (2d Cir.1983); *Baker*, 543 F.Supp. at 500.

Here, no underlying facts about the "manner" of Rastelli's violation were provided, so this "factor" provides no basis for continuing Rastelli to expiration.

Respondents' papers make clear the government's motivation for continuing Rastelli to expiration: the belief that Rastelli is the "Boss" of the Bonanno family. *See, e.g.,* Respondents' Memorandum at 13, 16, 26; Sadowski Aff., Exh. I at 2 & 5; Exh. J at 1, 2; Zaccheo Aff. ¶ 16. The Commission could readily have revoked Rastelli's parole, and continued him to expiration, if it had found that he was engaged in illegal activity. *See* 28 C.F.R. § 2.40(a)(6) (1984). But the Commission did not charge Rastelli with engaging in criminal activity, and it did not find that he was associating with persons engaging in such activity. Furthermore, it did not base the decision it made on any of the evidence presented at the revocation hearing concerning Rastelli's alleged ties to organized crime.

During the pendency of Rastelli's administrative appeal, the Commission was advised that Rastelli had been indicted in *United States v. Salerno*, 85 Cr. 139, popularly known as the "Commission" or "Five Families" case. "The Commission decided not to consider this indictment against Mr. Rastelli at [that] time." Sadowski Aff. ¶ 18. Nevertheless, respondents attached a copy of the indictment to their memorandum of law, and twice implied that, should this court grant Rastelli's writ, the Commission would attempt to revoke his parole on the basis of these new accusations. *See* Sadowski Aff. ¶ 18; Respondents' Memorandum at 24 n.*. In addition, Rastelli's counsel has informed the court that Rastelli was served with a detainer on May 23, 1985 relating to the charges made in *Salerno.* Letter to the Court from Stanley A. Teitler, Esq. (June 5, 1985). One might understand these statements and actions as suggesting that Rastelli is the kind of person who deserves to be kept in prison, and that reviewing the Commission's reparole decision is pointless because, if its action here is invalidated, it will merely renew the

whole revocation process based on a different charge. But "in the revocation decision, [the Commission is] not making a decision whether the man is 'good' or 'bad' or whether he has 'changed'; [it is] simply making a judgment as to whether he did an act which is going to justify putting him back in prison." *Hearings, supra,* at 239 (statement of Howard Eglit, Esq., former counsel to House Subcommittee holding hearings on PCRA). This court's duty is to review that decision, which for the reasons given above, cannot be sustained.

### III. *Conclusion.*

Rastelli has been incarcerated since August 16, 1984 on this charge, almost ten months. His petition for a writ of habeas corpus is granted, but issuance of the writ is stayed for thirty days, during which time the Commission must commence a new parole revocation proceeding, or seek to justify his continued detention on some legally sufficient basis.

SO ORDERED.