**UNITED STATES of America ex rel. Birchel Leonard CARSON, Petitioner-Appellee,**

v.

**Larry TAYLOR, Warden, Metropolitan Correctional Center, and John T. Connolly, Chief Probation Officer, Southern District of New York, Respondents-Appellants.**

No. 1029, Docket 76–2006.

United States Court of Appeals, Second Circuit.

Argued May 14, 1976.

Decided July 22, 1976.

Phylis Skloot Bamberger, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for petitioner-appellee.

Peter C. Salerno, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., Alan Levine, Steven J. Glassman, Asst. U. S. Attys., New York City, of counsel), for respondents-appellants.

Before SMITH, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

On May 18, 1972, appellee Birchel Leonard Carson was convicted in the United States District Court for the Southern District of New York of interstate transportation of forged securities in violation of 18 U.S.C. §§ 371 & 2314. On June 16, 1972, he was sentenced to a prison term of five years. On January 30, 1975, he was released pursuant to a Certificate of Mandatory Release, 18 U.S.C. § 4164, which obligated him to remain under supervision as if under parole until the expiration of his term less 180 days.

On July 2, 1975, the United States Board of Parole sought a parole violation warrant for Carson on two grounds: (1) that he had failed to submit his supervision report for May, 1975, and (2) that he had failed to report a change of address. The next day he was arrested in Biloxi, Mississippi, and on July 15 he was afforded a preliminary hearing before Chief Probation Officer Gerald W. Brown at Gulfport, Mississippi. Carson then was moved to the New York Metropolitan Correctional Center, where he arrived on August 15. His parole revocation hearing was held on September 24, 1975.

The two charges against Carson of which he had notice prior to the hearing were detailed in a letter from his parole officer, Roger H. Berger, who originally had applied for the violator warrant and who appeared to testify at the proceedings. Carson, who was represented by counsel, denied both charges contained in the warrant. He claimed to have sent Berger a letter dated May 29, 1975, which amounted to a supervision report and a report of his address change. The usual supervision report form apparently had not reached Carson because it had been mailed to him under a different name. At the hearing Carson produced a photocopy of the letter which he testified that he had sent as his supervision report to Berger at the end of May. He also testified that he had attempted to telephone Berger and to leave messages concerning his whereabouts. Berger denied having received either the letter or the telephone messages. Moreover, responding to questions, Carson admitted that, in visiting Biloxi and Canada on an earlier trip, he had traveled outside his parole district without receiving specific permission from his parole officer. He acknowledged, however, that on other occasions when he left the Southern District of New York he had always obtained specific permission, either written or oral, before departing. Berger testified, on the other hand, that he had not given Carson blanket permission to travel outside the district but that, on the contrary, he had advised Carson that he must stay within a 75-mile radius of New York City unless he received written permission from the Parole Board to go beyond this radius. Carson, in turn, conceded that he had received specific written permission for all trips outside the district except those to Canada and Mississippi.

The hearing then passed to consideration of Carson's activities apart from the specific violations charged in the warrant and his admitted travels outside the parole district. Information favorable to Carson concerning his attempt to earn a living by booking bands and operating a discotheque was elicited and corroborated. However, Berger also testified concerning various allegations contained in documents in Carson's parole file suggesting that he may have committed other offenses or engaged in undesirable conduct while on parole. The documents were never shown to Carson who had to rely upon Berger's summaries in fashioning his responses.

After a short conference following the hearing, the examiners orally announced that Carson's mandatory release had been revoked. They specified three specific violations as grounds for their decision: (1) Carson had failed to submit the proper supervisory report; (2) he had failed to report a change of his address; and (3) he admitted having departed the jurisdiction without permission. The examiners, furthermore, decided to confine Carson for the expiration of his term because

> "we feel your release at this time would depreciate the seriousness of your mandatory release and promote disrespect for the mandatory release process and we do not think that there is a reasonable probability at this time that you would [conform to the] conditions of your mandatory release."

After the hearing, Carson renewed his petition for a writ of habeas corpus.[1] On November 14, 1975, the United States District Court, Southern District of New York, Marvin E. Frankel, *Judge,* granted the writ. See 403 F.Supp. 747. Holding that Carson had been denied due process, Judge Frankel based his decision on (1) the three-month delay between the date of Carson's arrest in Biloxi and his hearing date, which was deemed excessive; (2) the hearing examiner's reliance upon undisclosed information; (3) the rambling disorderliness of the hearing; and (4) the inadequacy of the statement of reasons supporting revocation. We affirm the grant of the writ of habeas

---

1. Carson originally sought the writ of habeas corpus in September, 1975, upon his arrival in New York but before the revocation hearing was held. His original application was based on the delay in holding the revocation hearing following his arrest in Biloxi. Judge Frankel did not rule on this application at that time since a hearing was then imminent.

corpus. However, in doing so we find it unnecessary to pass on grounds (1) and (3) asserted by Judge Frankel. Nor does our holding imply that we necessarily share his characterizations of the Parole Board's conduct in this case.

## DISCUSSION

As with most procedural due process questions, a tension permeates parole revocation procedure. On the one hand, there is the disinclination to convert the revocation hearing into a full-blown adversarial process, equipped with the totality of formal rights and procedures associated with a criminal trial. On the other, there is the necessity of channelling the Parole Board's discretion in a responsible fashion, so that the decision, which is of prime importance to the parolee's life and liberty, is not tainted by unfairness or carelessness.

In *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court attempted to strike a balance between these divergent interests, the one institutional and the other individual. Beginning "with the proposition that the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations," *id.* at 480, 92 S.Ct. at 2600, the Court nonetheless proceeded to recognize that revocation of parole inflicts a " 'grievous loss' on the parolee" and therefore the proceeding "calls for some orderly process . . . ," *id.* at 482, 92 S.Ct. 2593. This principle has since been applied in a variety of similar contexts. See, e. g., *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 879 (1974); *Cardaropoli v. Norton,* 523 F.2d 990 (2d Cir. 1975).

In enunciating minimum requirements of due process for parole revocation proceedings, the *Morrissey* Court did not embrace the full trappings of a criminal trial. Instead, it mandated

"(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body . . . ; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S. at 489, 92 S.Ct. at 2604.

These requirements are designed to further a variety of specific but vital objectives: (1) minimization of surprise so that the parolee may formulate and organize a coherent and complete defense; (2) the opportunity directly (and thus more effectively) to challenge witnesses speaking against him; and (3) objective decisionmaking based on an accurate account of the parolee's conduct. With these "minimum requirements of due process," 408 U.S. at 489, 92 S.Ct. 2593, in mind we turn to two of the contentions advanced by appellee in the district court, which we believe to be dispositive of this appeal: that there was inadequate "written notice of the claimed violations of parole" and insufficient "disclosure to the parolee of evidence against him."

*Notice*

█ Although Judge Frankel did not expressly rule on this issue, appellee emphasizes that the disparity between the notice afforded Carson and the Parole Board's asserted grounds for its decision offends the due process requirements outlined in *Morrissey* and highlighted by our recent decision of *Kloner v. United States,* 535 F.2d 730, Dkt. No. 75–2316, Slip Opin. 3661, 3668–69 (2d Cir. May 10, 1976). More specifically the Board, as its third ground for revocation of parole, relied upon Carson's admissions during the course of the hearing that in visiting Biloxi, Mississippi, and Canada, he had twice ventured outside his parole district without specific permission. Although the Board, well in advance of the revocation hearing, was aware of these violations,[2] they were never mentioned as a

---

2. The trip to Canada was revealed in documents dated June, 1975, available a few days

before the violator's warrant was issued and three months before the commencement of the

ground in the violator's warrant or in any subsequent notice, despite *Morrissey's* requirement of "written notice of the claimed violations of parole," 408 U.S. at 489, 92 S.Ct. at 2604. Nevertheless the hearing examiners proceeded to inquire into Carson's allegedly unauthorized travels to Mississippi and Canada and to include this ground as a reason for revoking parole.

Under these circumstances the absence of written notice with respect to the third violation cannot be squared with *Morrissey* and *Kloner.* It would have entailed little inconvenience to the Board to have supplemented the violator's warrant with further written notice apprising Carson that he must be prepared to answer charges concerning his impermissible trips, either by way of contradiction or mitigation as permitted by *Morrissey,* 408 U.S. at 488, 92 S.Ct. 2593. As in *Kloner,* we are unwilling "to speculate what action [the Board] would have taken if proper notice had been furnished with respect to the [third] claim and if the defendant had had the opportunity to prepare and present mitigating evidence in rebuttal." 535 F.2d at 735. Consequently, we find that the requirement of prior notice, so central and well recognized an element of procedural due process guarantees, see *Gagnon v. Scarpelli, supra,* 411 U.S. at 782, 93 S.Ct. 1756; *Wolff v. McDonnell, supra,* 418 U.S. at 563–64, 94 S.Ct. 2963; *In re Gault,* 387 U.S. 1, 31–34, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Cardaropoli v. Norton, supra,* 523 F.2d at 996, has not been met in this case.

■ We do not intend this decision to be viewed as establishing a rule to the effect that in the absence of prior notice to the parolee the Parole Board may never rely upon a parolee's admission of violations as a basis for revoking parole.[3] A *per se* ban of that sort would run counter to the teaching of *Morrissey* that "it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were," *id.* 408 U.S. at 480, 92 S.Ct. at 2599, which was a clear invitation to the Board to inquire into the particulars of the parolee's conduct. Furthermore, such an ironclad rule could prove too impractical, since it would in effect compel the Board, each time an unexpected admission surfaced during the course of a hearing, to adjourn the proceeding to permit the giving of written notice of the violation admitted.

■ The Board should not, therefore, be precluded in appropriate cases from basing revocation of parole upon new and unexpected violations disclosed during the course of a hearing. However, where the Board has advance information or reason to believe that a violation has occurred, prior notice to the parolee is essential. This was the essence of our holding in *Kloner.* Crucial to the decision in that case was the recognition that Kloner's admission was not a spontaneous or unexpected one, but was deliberately elicited by the Parole Board on the basis of prior information. As we emphasized there, "[t]he second ground, however, was not the subject of any notice to Kloner prior to the revocation hearing, even though the alleged violation apparently was brought to the attention of the Regional Director of the Board of Parole some months earlier." 535 F.2d at 735, & n. 4.

revocation hearing. Obviously, with Carson's arrest in Mississippi on July 3, 1975, the Board was made aware of his impermissible trip thereto and could have provided notice of this violation prior to the September hearing.

**3.** We also reject appellee's apparent argument that the due process right of notice outlined in *Morrissey* and *Kloner* is offended by technical and nonprejudicial variances between the written notice and the Parole Board's final findings of violations. For example, we find no infirmity in the fact that, although the notice in this case charged failure to submit a supervision report, the Board's reasoning faulted Carson for failing "to personally visit the parole officer and take care of this matter." Since it is obvious that the failure to visit the office is a normal subject of inquiry when considering the failure to submit a report to the parole officer, Carson could not have been surprised when asked if he had ever visited his officer to acquire and complete a proper supervision report and the Board was not obligated to specifically charge Carson's failure to come to the parole office.

In such an instance, where the Board undisputably is aware of the alleged violation in advance of the hearing and probes for an "admission," we find no logical explanation for failure to provide notice to the parolee.

*Nondisclosure of Evidence*

██ As a primary basis for granting the writ of habeas corpus, the district court found "that the hearing examiners relied upon undisclosed evidence in deciding that petitioner's parole should be revoked." 403 F.Supp. at 753. Although Parole Officer Berger summarized the contents of the documents and Carson was afforded the opportunity to respond to the summaries, the district court concluded that the use of such summaries failed to comply with *Morrissey's* requirement of "disclosure to the parolee of evidence against him," 408 U.S. at 489, 92 S.Ct. at 2604. We agree that a refusal to provide the parolee with access to the actual documents employed against him, without a showing of good cause for such secrecy, is impermissible.[4]

██ A parolee must be afforded the opportunity for effective rebuttal of allegations against him. Although a formal hearing and formalized cross-examination are not necessary, the Supreme Court recognized in *Morrissey* that no one's interest—neither the public's nor the parolee's—is fostered by exposing a parolee to a substantial risk of recommitment upon the basis of erroneous impressions or conclusions grounded on innuendo or exaggeration, as distinguished from "verified facts," 408 U.S. at 484, 92 S.Ct. 2593. To insure against such an eventuality "On request of the parolee, a person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence." 408 U.S. at 487, 92 S.Ct. at 2603. The Board may not circumvent this requirement by declining to offer the witness' live testimony and relying instead on summaries of what he would testify if called. Rather, only if the hearing examiner finds good cause for not producing the witness—specifically if he "determines that an informant would be subjected to risk of harm if his identity were disclosed," *id.* at 487, 92 S.Ct. at 2603—can the government be excused from proffering the "best evidence." Cf. *Birzon v. King,* 469 F.2d 1241, 1244–45 (2d Cir. 1972). However, the Supreme Court has also recognized that "the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." 408 U.S. at 489, 92 S.Ct. at 2604.

██ Realistically viewed, the parolee's right to scrutinize documents containing incriminating information that will be used against him at his revocation hearing is just as important as his right to question adverse witnesses. Indeed, the institutional dislocation occasioned by permitting the parolee to have access to documents or letters that are to be used against him would be substantially less significant than that caused by having to produce live witnesses at the parolee's request. Cf. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810, 4491–92 (1976); *Wolff v. McDonnell, supra,* 418 U.S. at 566, 94 S.Ct. 2963; *Richardson v. Perales,* 402 U.S. 389, 406, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Consequently, the institutional interests of the parole administration do not justify nondisclosure of relevant documentary information.

Furthermore, because of the risks of distortion or subtle changes of meaning, a parole officer's summary of documents containing incriminating information that may be disputed by the parolee does not constitute an adequate substitute for the document itself, particularly since, as the Supreme Court recognized in *Morrissey,* the

---

4. We find no merit in the government's suggestion that Carson waived his claim to disclosure by failing to specifically request "further particularization." It is undisputed that prior to the hearing, Carson wrote letters to the Parole Board and asked to see his files. The Board denied the request. In any event, we would require the clearest evidence of an intentional waiver before denying a parolee the "minimum requirements of due process." 408 U.S. at 489, 92 S.Ct. 2593.

parole officer, who often is responsible for requesting the parole violation warrant and convening the revocation hearing, cannot always be expected to approach his task with "complete objectivity," 408 U.S. at 486, 92 S.Ct. 2593. "Parole agents are human, and it is possible that friction between the agent and parolee may have influenced the agent's judgment." *Id.* at 486 n. 14, 92 S.Ct. 2603, *citing* 4 Attorney General's Survey on Release Procedures: Parole 246 (1939).[5] For these reasons, absent a showing of unusual circumstances, we decline to hold that due process requirements were met in this case by the furnishing of oral summaries at the hearing itself.

■ It must also be remembered that, although the Board is obligated to furnish a written statement of the evidence relied on, its parole revocation decision often is not predicated upon well defined and clearcut criminal offenses. Instead, the hearing examiners are afforded substantial discretion to revoke parole upon the basis of generalized impressions of the parolee's past conduct and predictions of future adjustment. In this case, for example, the examiners ordered Carson's reincarceration because, in their rather inelegant jargon, they concluded: "[Y]our release at this time would depreciate the seriousness of your mandatory release . . . and we do not think that there is a reasonable probability at this time that you would [conform to the] conditions of your mandatory release. . . ." Assuming that a revocation decision may turn upon such impressionistic conclusions, it becomes all the more important to provide advance disclosure of the documentary proof upon which it is based in order to safeguard against the Board's substitution of rumor, exaggeration, or faulty characterizations concerning the parolee's conduct for facts. The due process requirements of *Morrissey* are designed to minimize just such a risk.

Turning to the record before us, a comparison of Parole Officer Berger's summaries at the revocation hearing in the present case with the actual content of some of the documents in question highlights the potential for inaccuracies and distortion inherent in such summarization. For example, one letter in the file stated that Carson attempted to obtain employment as a booking agent for a night club and that "[t]here is some speculation that [one of the individuals associated with the club] has connections with organized crime." At the hearing this passage was unfavorably characterized as stating that "of the associates that Mr. Carson wanted to go into business with, . . . other fellows involved were considered to be front men for the Mafia." Similarly, at the hearing Berger reported that during April-May of 1975, Carson "was under investigation by the FBI for the fraudulent . . . cashing [of checks]." Left unmentioned was the exculpatory statement that the documents further disclosed that there was "no hard evidence" against the parolee, and that "[w]e have been informed by the FBI that the parolee is no longer the subject of their investigation." Finally, along similar lines, Berger informed the hearing examiner that Carson gave to an attorney a "bum" check that did not clear when deposited. The document in question, however, contained evidence which raised legitimate questions concerning the good faith of this attorney's allegations and that supported Carson's explanation that he had arranged to repay the debt through other means. Yet this document was never made available to the parolee. Thus the record amply supports the district court's conclusion that the parole officer's summary of relevant documents was not "meaningful." 403 F.Supp. at 753–54 n. 4.

■ Nor can we agree with the government's apparent suggestion that nondisclosure of documentary proof is permissible as long as the evidence is used in the dispositional stage of the proceedings rather than in determining the existence of parole violations. All aspects of a revocation hearing

---

5. Indeed, the record of this hearing reveals several passages where such personal friction between Carson and Berger is alluded to.

are designed to answer the ultimate question of whether "the parolee is entitled to retain his liberty . . . ." 408 U.S. at 479, 92 S.Ct. at 2599. Although this decisionmaking is carried out in two stages—(1) the determination of whether there has been a violation and, if so, (2) the decision as to whether parole should be revoked— the second, or dispositional, step, like the first, "depends on facts," requiring an accurate assessment of the parolee's past conduct and of the likelihood "of restoring him to normal and useful life within the law." *Id.* at 480, 484, 92 S.Ct. at 2601. In both steps the need to filter out distorted summaries of relevant facts is important. Accordingly, we conclude that the requirement of "disclosure to the parolee of evidence against him" does not turn on the stage of the proceeding in which the information is introduced.[6]

■ In summary, we hold that due process requires that the parolee be afforded access to the documents that will be introduced against him, unless the Parole Board meets the burden of establishing good cause for their nondisclosure, e. g., that disclosure will lead to reprisals or substantially interfere with a pending criminal investigation involving an allegation contained in the documentary record.

■ Here the Board's failure to disclose relevant incriminating documents to the parolee was never justified and therefore cannot be permitted to stand. Neither at the parole revocation hearing, where the matter must ordinarily first be raised, cf. *Birzon v. King, supra,* 469 F.2d at 1244–45, nor in these proceedings has the government offered any explanation for its unwillingness to disclose the "secret file" to Carson. Having examined that file, we, like Judge

Frankel, "perceive no evident justification for the secrecy." 403 F.Supp. at 753.

Affirmed.

---

6. For this reason we reject the government's argument that nondisclosure in this instance is permissible since "[t]here is no support in the record . . . for Judge Frankel's contention that these documents were used to find that Carson had violated his parole conditions." The record unequivocally supports the conclusion that undisclosed evidence formed an important part of the proof introduced at the dispositional stage of the hearing. See 403 F.Supp. at 753. Indeed, the United States At-

torney acknowledged that "the government does not contend that [the documents were] not important at the hearing," and agreed with Judge Frankel's argument that "isn't it clear to you that if you refer to papers in formulating your questions and your thoughts in the course of the hearing that those papers become part of the materials that affect your ultimate decision one way or another?" Thus, the evidence was still used "against" the parolee as specified in *Morrissey.* See 408 U.S. at 489, 92 S.Ct. 2593.