**Clarence NIXON, Appellant,**

v.

**Margaret QUICK, et al., Appellees.**

**No. 98–SP–589.**

District of Columbia Court of Appeals.

Argued Nov. 4, 1999.
Decided Sept. 27, 2001.

Hastings Jones, Public Defender Service, for appellant.

Mary L. Wilson, Assistant Corporation Counsel, with whom John M. Ferren, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellees.

Before WAGNER, Chief Judge, and SCHWELB, Associate Judge, and PRYOR, Senior Judge.

WAGNER, Chief Judge:

Appellant, Clarence Nixon, appeals from the summary denial of his petition for a writ of habeas corpus without a hearing. In his petition in the trial court, Nixon alleged that the District of Columbia Board of Parole denied him a fair parole revocation hearing by: (1) excluding him from the revocation hearing during the testimony of an adverse witness; (2) refusing to disclose to him prior to the hearing a letter from his former girlfriend which was used as evidence against him; and (3) failing to hold the hearing within a reasonable time. We conclude that Nixon has alleged sufficient facts to entitle him to a hearing; therefore, we reverse and remand for further proceedings consistent with this opinion.

### I.

Nixon is currently serving the remainder of sentences imposed by Superior Court totaling three years nine months to twelve years six months for multiple offenses following revocation of his parole by the District of Columbia Parole Commission.[1] Nixon was given probation on the original sentences, but the court revoked probation and imposed the original sentence in 1981 following his conviction for kidnaping in Louisiana for which Nixon served an eighteen month sentence. Nixon was paroled into the community from his D.C. sentences on April 4, 1984, but his parole was revoked because of a conviction for child abuse in Prince George's County Maryland where he was sentenced to a term of incarceration.[2] He resumed serving his current sentence, and was granted parole again on February 23, 1994.

On February 24, 1997, the Board of Parole issued Nixon a parole violation notice based on allegations that he had violated the law, as reflected by two arrests in Maryland. One of the arrests was for breaking and entering the home of Michellie Douglas; however, Nixon was found not guilty of this offense after a jury trial. Ms. Douglas, who had a child in common with Nixon, obtained a protection order based upon Nixon's threats of violence against her. Nixon's second arrest on January 7, 1997, which resulted in his conviction in the District Court of Maryland for Prince George's County, was for violation of the civil protection order. The court sentenced Nixon to ninety days in jail, suspended the execution of sentence and placed him on unsupervised probation for three years with the condition that he have no contact with Ms. Douglas.

The parole violation warrant issued on February 24, 1997 was served upon Nixon on April 14, 1997. Nixon then signed a Notice of Hearing Rights, which stated, *inter alia*, that Nixon was entitled:

[ ] To have disclosure of the evidence against you;

1. Following parole revocation, Nixon is serving the remainder of his terms for the following offenses: assault with a deadly weapon, three to ten years; two counts of simple assault, three to twelve months each; unlawful entry, one to three months; unlawful taking of property one to three months (two counts); and an additional assault count, one to three months.

2. The charge arose out of Nixon beating his three-year-old stepchild with a leather belt.

[ ] To request that the Board make available for questioning at the hearing any person who has given information against you on which the Board may rely to revoke your parole, unless granting this request would subject any person to a risk of harm;

[ ] To confront and cross-examine witnesses unless the Hearing Official determines that confrontation would subject any person to a risk of harm;....

The notice specified a hearing date of May 6, 1997, which was crossed out, and the hearing was reset for June 3, 1997 at the request of Nixon's attorney. The case was continued until July 3, 1997 pending disposition of the case pending against Nixon in Maryland for violating the protective order. Revocation occurred on October 10, 1997.

Although Nixon was found not guilty of the breaking and entering charge, the parole determination record reveals that he admitted at the revocation hearing that he became upset with Ms. Douglas on May 30, 1996, the offense date, and went into her home with the intention of waiting until she arrived.[3] He also admitted violating the protective order in Maryland. Ms. Douglas requested, and was permitted, to speak to the Board outside of the presence of Mr. Nixon because she indicated that she feared for her safety because of his past threats. Nixon's counsel objected on the ground that Nixon's exclusion violated his right to confront the witnesses against him. Nixon's counsel was present for Ms. Douglas' testimony and cross-examined her.[4]

In addition to her testimony, Douglas had submitted a letter to the Board that was shown to Nixon's counsel at the hearing.[5] The Board found that Nixon had violated the conditions of his parole based upon his two law violations and for crimi-

3. According to the findings, Nixon became upset with Ms. Douglas and broke in because "he wanted to show her [that] her home was not as secure as she thought, with the bars and all."

4. The parole determination contains a summary of the information provided by Ms. Douglas, which states the following:

[Nixon] had been harassing her frequently-they have a child together-on 5/20/96, subject confronted Ms. Douglas in her work parking lot, then later the police called her and told her he'd broken into the house. He called her again the same week and she learned he was in a psychiatric hospital. She filed for the restraining order. It took sheriffs 2 months to serve him the order because he refused to open the door. He continued to call her, nonetheless, before and after being served. In December, there was a custody and support hearing and subject learned of her new phone number and called her constantly—ring and hang up all day. She charged him with violating the restraining order. He was arrested 3/20/97. No contact since. She has since changed her [telephone number]. After breaking into the house, subject tried to break into the babysitter's house. On 5/20/96 [Nixon] kept saying over and over again—"let's get back together, if not I know where your pride and joy is"—meaning, she thought, he'd hurt their child. Later that day, when he broke into the house she knew he had the means.... Ms. Douglas states she knew [Nixon] had a violent criminal record. She believed he had psychological problems b/c he changed from Dr. [Jekyll] to Mr. Hyde when she became pregnant and tried to assert control over her.

* * * *

Ms. Douglas states she is afraid for her life [and] her son's life. She knew he had abused his ex-wife's son (he was sentenced to 15 years for child abuse in 1985 in P.G. Co.). Ms. Douglas states [Nixon] has never hit her or her son, but her fear arises from his rages and attempts to control her.... Ms. Douglas requests [Nixon] receive psychological intervention. She hopes he reaches a state when they can have a relationship again and he can be a father to his child.

5. The record does not contain the letter.

nal and non-criminal violations, and subsequently revoked his parole.

Nixon filed a petition for a writ of habeas corpus in Superior Court, contending that the Parole Board had denied him the following rights: (1) prior disclosure of the evidence to be used against him at the hearing; (2) confrontation and cross-examination of the witnesses providing adverse information at the hearing; and (3) a timely hearing on the alleged violations. First, he challenged the Board's failure to disclose to him the letter from Ms. Douglas, which he contends was used against him. According to the petition, the hearing officer only permitted the letter to be disclosed to Nixon's attorney on the condition that the attorney not show it to Nixon. Second, Nixon argued that his right to confront and cross-examine witnesses was violated when the hearing officer refused to allow him to be present during Ms. Douglas' testimony, although his counsel was present and cross-examined her. Third, Nixon argued that his right to a timely hearing was violated because the time from the execution of the parole violation warrant to the time of the hearing was approximately 200 days. The Board argued in its response to the trial court's order to show cause why a Writ of Habeas Corpus should not be issued that: (1) Nixon's confrontation rights were not violated because his attorney cross-examined the witness; (2) the hearing official had good cause to exclude Nixon's presence during Ms. Douglas' testimony and to restrict him from seeing her letter in order to minimize the safety risk to the witness; (3) Nixon failed to show any prejudice resulting from the Board's procedure; (4) the Board's decision was not based upon the letter at issue, but upon law violations which were established; (5) the Board conducted the hearing within ninety days of Nixon's arrest, a significant portion of the delay was caused by Nixon, and Nixon had alleged no nexus between the delay and the results of the revocation hearing; and (6) Nixon would not be entitled to immediate release, and the merits of the Board's decision are not subject to judicial review. Upon consideration of the petition and the response thereto, the trial court denied the petition without a hearing.

## II.

On appeal from the denial of a petition for writ of habeas corpus, "this court does not review the merits of the [D.C. Parole] Board's decision, but only whether the petitioner has been deprived of his legal rights by the manner in which the revocation hearing was conducted, in order to determine whether there has been abuse of discretion." *Stevens v. Quick,* 678 A.2d 28, 31 (D.C.1996) (quoting *Bennett v. Ridley,* 633 A.2d 824, 826 (D.C. 1993)). A parole hearing is subject to minimal constitutional due process protections which the Supreme Court outlined in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). These requirements include:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.* at 489, 92 S.Ct. 2593. A code of procedure is the responsibility of each state. *Id.* at 488, 92 S.Ct. 2593. The District of Columbia has set forth these minimal re-

quirements in virtually identical language in regulations governing parole revocation hearings. *See* 28 DCMR § 219.1(b).[6] These due process procedures are mandated for parole revocation. *Brown–Bey v. Hyman,* 649 A.2d 8, 9 (D.C.1994).

Nixon argues on appeal that the conduct of his hearing was not in compliance with the minimum due process requirements set forth by the Supreme Court in *Morrissey* and in the District's regulations. Specifically, he contends that he was denied the right to a fair hearing because the Board concealed from him before and during the hearing a letter used against him from Michellie Douglas, the complaining witness in the breaking and entering and protection order cases. He contends that the letter from Ms. Douglas contained additional allegations (*e.g.,* harassing phone calls, threats to his child and a visit to the child's babysitter). He argues that these allegations made up the main substance of the evidence against him, since he was found not guilty at the trial on the break-

ing and entering charge. He also argues that he was denied the right to be present during the cross-examination of Ms. Douglas, although his attorney was permitted to cross-examine her. The Board responds that the Douglas letter did not form the basis for the Board's decision and that, in any event, Nixon's attorney was permitted to review the letter at the hearing and to cross-examine the witness. The Board also contends that there was an adequate basis to exclude Nixon from the hearing during cross-examination of the witness and to preclude him from seeing her letter because of safety concerns.

 A person on parole who is subject to revocation must have an effective opportunity to rebut the allegations against him. *See Morrissey, supra,* 408 U.S. at 489, 92 S.Ct. 2593. Upon request, a person who is providing adverse information should be made available for cross examination in the presence of the parolee. *Id.* at 487, 92 S.Ct. 2593. The regulations

6. **28 DCMR § 219. Revocation of Parole: Preliminary Interviews and Revocation Hearing**

219.1 An alleged parole violator retaken under a warrant issued by the Board or a member thereof has the right to have a preliminary interview conducted by the Board, a member of the Board, an examiner or an official designee at or reasonably near the place of the alleged parole violation or arrest, without unnecessary delay. The purpose of the preliminary interview shall be to give the alleged violator notice of the following:
(a) The condition(s) of parole alleged to have been violated or offense(s) alleged to have been committed;
(b) The right to written notice of the claimed violations of parole; disclosure to the parolee of evidence against him or her; and opportunity to be heard in person, to present witnesses and documentary evidence, and to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation) at a hearing before

the Board or a member of the Board; and a written statement of the Board's final determination;
(c) The approximate time, place, and purpose(s) of the revocation hearing; and
(d) That if he or she admits the charge(s) and waives his or her right to be represented by counsel, and to present and confront witnesses at a revocation hearing before the Board or a member thereof, the person conducting the preliminary interview will conduct the revocation hearing at that time and place.

219.3 If the parolee chooses to exercise his or her right to a revocation hearing before the Board or a member of the Board, the revocation hearing shall be held at or reasonably near the place of the alleged parole violation or arrest, within sixty (60) days of the preliminary interview.

219.9 Counsel may be retained by the parolee, or if he or she is financially unable to retain counsel, repres[e]ntation may be obtained pursuant to applicable provisions of the District of Columbia Criminal Justice Act.

in the District are to the same effect. *See* 28 DCMR § 219.1(b). Although a parole revocation hearing is not a criminal prosecution and does not have all of the safeguards of a criminal trial, the Supreme Court has identified the rights of confrontation and cross-examination as among the minimum requirements of due process in such a proceeding. *Morrissey*, 408 U.S. at 489, 92 S.Ct. 2593. An exception exists, however, where "the hearing officer specifically finds good cause for not allowing confrontation." *Id.* Where, for example, "an informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination." *Id.* at 487, 92 S.Ct. 2593.

■■■■■ "The parolee's right to scrutinize documents containing incriminating information that will be used against him at his revocation hearing is just as important as his right to question adverse witnesses." *United States ex rel. Carson v. Taylor*, 540 F.2d 1156, 1161 (2nd Cir.1976). The parolee, whose liberty is at stake, and society "ha[ve] an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions." *Morrissey, supra*, 408 U.S. at 484, 92 S.Ct. 2593. If the relevant information is not disclosed to the parolee, then there would be no opportunity for him or her to refute or explain the information. "The very purpose of notice and a hearing is to permit a parolee the opportunity to contest the facts and present a defense or mitigating factors." *Vanes v. United States Parole Comm'n*, 741 F.2d 1197, 1200–01 (9th Cir.1984). Local regulations protect this right by providing for written notice to the parolee of his right to disclosure of the evidence against him or her. 28 DCMR § 219.1(b). However, as the Board argues, the safety exception recognized in *Morrissey* for protecting the informant's identity logically extends to documentary information. *See Birzon v. King*, 469 F.2d 1241, 1245 (2nd Cir.1972). We agree with the court in *Birzon* that the exception requires the Board "to disclose to the parolee so much of the substance of the informants' accusatory statements as it finds consistent with their safety." *Id.*

■■■■ The question remains, however, whether good cause was shown for the application, in this case, of the safety exception to the due process disclosure and cross-examination requirements for parole revocation hearings. *See Morrissey, supra*, 408 U.S. at 489, 92 S.Ct. 2593; 28 DCMR § 219.1(b). The Board argues that the witness here feared for her safety and for the safety of her child, and that therefore, the procedure was authorized under *Morrissey*. The safety exception appears to be more narrow than the Board suggests. *Morrissey* provides for application of the exception where there is a showing of a risk of harm if the identity of the witness is disclosed. *Morrissey*, 408 U.S. at 487, 92 S.Ct. 2593. Here, the identity of the witness was known to Nixon because Ms. Douglas was the complaining witness for both of the offenses for which he received notice of revocation. He was also informed that she would be the witness at the revocation hearing. What the Board restricted Nixon from knowing was the substance of the witness' adverse information against him.

As previously stated, the exception requires disclosure to the parolee of "so much of the substance of the informants' accusatory statements as it finds consistent with their safety." *Birzon, supra*, 469 F.2d at 1245. Here, the Board did not make a finding that nothing less than total exclusion of Nixon during the cross-examination and nondisclosure of the contents of the letter was required in order to avoid danger to the witness. The Board's de-

tailed summary of the witness' testimony in the final order suggests otherwise. In these circumstances, we hold that, at the very least, the Board must make an express finding that the witness would be at risk for harm to his or her safety absent the restrictions imposed upon the confrontation and cross-examination rights of the parolee. *See Carson, supra,* 540 F.2d at 1161. Here, the Board only indicated that the witness was concerned for her safety. This is an inadequate basis for the curtailment of the parolee's rights.

 The Board argues that Nixon suffered no prejudice, as Nixon's counsel was permitted to cross-examine the witness. But Nixon's counsel was required to withhold the information in Ms. Douglas' letter from his client as a condition for counsel being allowed to see it. Therefore, there was no way for Nixon to be privy to the information in the letter at a meaningful time, and Nixon could not assist in any attempt to refute the letter's contents. *See Carson, supra,* 540 F.2d at 1161. A parolee's confrontation rights cannot be satisfied by allowing counsel to be present to cross-examine the witness; *the parolee has the right to be personally present.* First, the confrontation rights belong to the parolee.[7] Second, the exclusion of the parolee precludes whatever assistance he could provide the attorney in recognizing errors or exaggerations in the witness' testimony. *See id.* Neither the parolee's nor the government's interest is fostered by the risk of revocation based on "erroneous impressions or conclusions grounded on innuendo or exaggeration, as distinguished from 'verified facts.' " *Id.* (quoting *Morris-*

*sey, supra,* 408 U.S. at 484, 92 S.Ct. 2593.) "To insure against such an eventuality '[o]n request of the parolee, a person who has given adverse information on which parole revocation is to be based is to be made available for questioning *in his presence.*' " *Id.* (citing *Morrissey,* 408 U.S. at 487, 92 S.Ct. 2593) (emphasis added). Thus, unless the parolee waives his presence, or unless he is excluded because of a supportable finding of risk of harm, his rights are violated when he is excluded from the hearing during cross-examination of an adverse witness.

██ Because we conclude that the safety exception did not allow the Board to withhold Ms. Douglas' letter from Nixon or to exclude him during her testimony, we must next decide whether a hearing on Nixon's motion was necessary in order to determine whether Nixon was substantially prejudiced. Although Nixon's counsel received a copy of Ms. Douglas' letter at the hearing, counsel was allowed to review the letter only on the condition that it not be shown to Nixon. The record of the revocation hearing does not contain the letter, but refers to the letter in a remarks section as a "victim impact statement," apparently explaining Nixon's violation of the protective order and that Nixon had made threatening calls to the victim.[8] Nixon argues that the allegations of misconduct in the statement constitute uncharged violations of the conditions of parole. He also contends that the testimony of Ms. Douglas, taken out of his presence, constitutes the main substance of the evidence against him, particularly since he

---

7. *See Morrissey, supra,* 408 U.S. at 487, 92 S.Ct. 2593; 28 DCMR § 219.

8. The "analyst's remarks" in the Parole Determination Record refer to a Victim Impact Statement in the file, and state further that "Ms. William claimed in her statement that Mr. Nixon had made threatening telephone calls to her home." Ms. William may be a reference to Ms. Douglas, since the same paragraph notes that Mr. Nixon was found guilty of violating the protective order in Maryland, which had been secured by Ms. Douglas. In that connection, the remarks state, "[p]lease see attached statement from the victim."

was found not guilty of the breaking and entering charge.[9] The Board, conversely, argues that Nixon admitted the two charged parole violations, namely the breaking-and-entering and the violation of the protective order, and that these admissions alone warrant revocation of his parole. Additionally, the Board argues that, in making its revocation decision, it did not rely on the evidence provided by Ms. Douglas. We agree with the Board that Nixon's admissions were sufficient to support the Board's factual finding that a parole violation had occurred, but we agree with Nixon that a hearing on Nixon's motion was required to determine whether his due process rights were violated when the Board imposed revocation as the sanction for those violations.

 At a parole revocation hearing, the Board engages in a two-step analysis: It first makes a factual determination whether a parole violation occurred, and, if it finds such a violation, exercises its discretion to select an appropriate sanction. *E.g., Morrissey, supra,* 408 U.S. at 479–86, 92 S.Ct. 2593; *cf. Harris v. United States,* 612 A.2d 198, 207–08 (D.C.1992), *cert. denied,* 507 U.S. 1022, 113 S.Ct. 1826, 123 L.Ed.2d 455 (1993) (probation revocation). With regard to the first step—the determination whether Nixon violated parole—we deem dispositive Nixon's admissions that he broke into Ms. Douglas' home and that he violated the protective order. These admissions of the precise misconduct with which Nixon had been charged were alone sufficient to support the Board's finding that Nixon had violated his parole. *Morrissey,* 408 U.S. at 490, 92 S.Ct. 2593. To be sure, the Board revoked Nixon's parole "for criminal and noncriminal violations,"

and may therefore have relied not only on Nixon's admissions, but also on the additional information provided by Ms. Douglas which was improperly withheld from Nixon. *Id.* at 487, 489, 92 S.Ct. 2593. In this case, however, Nixon's admission that he engaged in conduct that itself constituted the charged parole violations was sufficient to satisfy the first step of the analysis. *See Harris,* 612 A.2d at 207–08.

But Nixon may nevertheless be entitled to relief because the Board imposed revocation, rather than a lesser sanction, for his parole violations. As we have noted, it is not clear from the record whether the Board relied solely upon the charged—and admitted—violations in deciding to revoke parole rather than to impose a lesser sanction. Indeed, by referring both to criminal and to non-criminal violations in its order of revocation, the Board implied that it had also considered the evidence of uncharged violations provided by Ms. Douglas, as well as Nixon's admissions, in reaching its decision.

 Moreover, the Board had available to it a number of alternative options as sanctions for Nixon's violations, including modification of the conditions of parole, reprimand, reinstatement of supervision, and residential community treatment. *See* 28 DCMR § 219.6. In making the final determination, the Board is required to consider, among other factors: the seriousness of the violations; whether the violations represent a continuing pattern or serious adjustment problems which could lead to further criminal involvement; and whether there are other negative adjustments by the parolee. *Id.* The statements in Ms. Douglas' testimony and reportedly

---

**9.** The summary of her testimony indicates that Ms. Douglas testified that Nixon had broken into her house. In addition, Ms. Douglas testified that Nixon tried to break into the babysitter's house; that he had made remarks

that appeared to be a threat to her child; that she was afraid for her life and her son's life; and that he had a violent criminal record and psychological problems.

in her letter are relevant to these considerations. Based only on the currently available record, we cannot be sure that the Board did not consider this information (as well as Nixon's admissions) in weighing the § 219.6 factors and in deciding to revoke Nixon's parole. We are therefore persuaded by Nixon's claim that he was entitled both to disclosure of all of the evidence that would be used by the Board in its consideration and to an opportunity to confront and attempt to refute all of the evidence against him. *See Morrissey, supra*, 408 U.S. at 489, 92 S.Ct. 2593. As indicated, additional allegations in Ms. Douglas' testimony and letter may have been used against Mr. Nixon as factors in the Board's decision to revoke his parole rather than to impose a lesser sanction. For these reasons, we cannot conclude on the present record that any due process violations in the Board's selection of revocation as the sanction to be imposed on Nixon were harmless.[10]

■■■ "[I]ssuance of the writ of habeas corpus is simply a means of bringing the petitioner before the Superior Court for a hearing on the petitioner's claim for relief." *Bennett v. Ridley*, 633 A.2d 824, 826 (D.C.1993). To be entitled to have the writ issued, the parolee only needs to present sufficient allegations, which, if proved, would entitle him to relief. *Id.* (citing *Price v. Johnston*, 334 U.S. 266, 292, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)). The court must determine whether the revocation proceeding was conducted in a manner which deprived the petitioner of his legal rights. *Id.* (citation omitted). Nixon set forth facts in his petition sufficient to make out a *prima facie* case with respect to the manner in which the hearing was conducted to entitle him to a hearing. He has alleged facts which, if proved, would indicate that he was denied his due process rights to confrontation and to timely disclosure of the evidence against him. For the reasons previously stated, the exhibits offered in response to the petition and the record herein are not sufficient to demonstrate as a matter of law that petitioner cannot prevail. Therefore, he is entitled to a hearing on his motion.

For the foregoing reasons, the order of the trial court denying the writ of habeas corpus is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

10. Nixon also argues that he was denied a fair hearing because of the Board's failure to convene the hearing for more than 200 days. The revocation hearing must be provided within a reasonable time after a parolee is taken into custody. *Morrissey, supra*, 408 U.S. at 488, 92 S.Ct. 2593. In *Morrissey*, the Supreme Court held that a lapse of two months is not unreasonable. *Id.* Local regulations provide that where a parolee exercises his right to a hearing, it shall be held within sixty days of the preliminary interview. 28 DCMR § 219.3. An agency is bound to follow its own regulations. *Abdullah v. Roach*, 668 A.2d 801, 806–07 (D.C.1995). However, we have not always construed the word "shall" as mandatory in the case of public agencies, particularly where no consequences are involved for not adhering strictly to specified timelines. *Adams v. Braxton*, 656 A.2d 729, 731 (D.C.1995), *cert. denied*, 516 U.S. 860, 116 S.Ct. 168, 133 L.Ed.2d 110 (1995). The record is inadequate for our review of this issue. To the extent necessary, upon remand, the trial court can address it.