582 S.E.2d 743

**STATE of West Virginia ex rel. Bruce PATTON, Petitioner,**

v.

**James RUBENSTEIN, Commissioner, West Virginia Department of Corrections and the West Virginia Board of Probation and Parole, Respondents**

No. 30967.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 21, 2003.

Decided Feb. 27, 2003.

Dissenting Opinion of Justice Albright July 2, 2003.

---

**10.** Because we are granting Mr. Ballard a new trial, we need not address the remaining assignments of error.

Matthew A. Victor, Victor, Victor & Helgoe L.L.P., Charleston, West Virginia, Attorney for the Petitioner.

Darrell V. McGraw, Jr., Attorney General, Heather A. Connolly, Assistant Attorney General, Charleston, West Virginia, Attorneys for the Respondents.

PER CURIAM:

Mr. Bruce Patton filed this petition for a writ of habeas corpus seeking relief from a

decision of the West Virginia Parole Board (hereinafter "Board") revoking his parole. Mr. Patton contends that the Board acted in an arbitrary and capricious manner in revoking his parole. Specifically, Mr. Patton contends that the evidence of parole violations, including mitigating circumstances, was inadequate to support the parole revocation; that the Board failed to adequately consider less restrictive alternatives; and that the poor audio tape quality prevented all members of the Board from reviewing the evidence presented at the parole revocation hearing prior to rendering the decision to revoke parole. Based upon the briefs, record, and arguments of counsel, we deny the requested writ of habeas corpus.

## I. Factual and Procedural History

Mr. Patton was sentenced to thirty years for aggravated robbery and breaking and entering. On December 21, 2001, after serving seven and one-half years of his sentence, Mr. Patton was paroled and subsequently became employed as a member of a towing crew. On June 24, 2002, after having been on parole for approximately six months, Parole Officer Pamela Baldwin filed a petition to revoke parole, charging Mr. Patton with the following five violations: (1) breaking the 9:00 p.m curfew on April 11, 2002; (2) visiting a bar on April 11, 2002; (3) driving on a suspended license on May 13, 2002; (4) possession of alcohol on June 6, 2002; and (5) driving on a suspended license on June 6, 2002. Subsequent to a July 30, 2002, hearing, the hearing examiner found probable cause on only charges one, three, and four.

On September 19, 2002, Board Chairman Douglas F. Stump conducted a final hearing in which Mr. Patton testified. The factual issues raised in the hearing testimony will be addressed in the Discussion section of this opinion. Subsequent to the revocation hearing, Chairman Stump, according to an affidavit signed by him, met with the other two signing members of the Board and "discussed the matter thoroughly" prior to rendering a decision to revoke parole on October 1, 2002. Chairman Stump also explained in the affidavit that the "Board does not routinely listen to or review audio tapes of revocation hearings in their entirety."

In seeking a writ of habeas corpus in this Court, Mr. Patton alleges that a thorough review of the evidence submitted in this case reveals the arbitrary and capricious nature of the Board's revocation decision. Moreover, Mr. Patton alleges that the Board filed to satisfy the requirements of *State ex rel. Eads v. Duncil,* 196 W.Va. 604, 474 S.E.2d 534 (1996), regarding review by all members of the Board prior to a revocation determination. We address these issues separately in this opinion.

## II. Standard of Review

 This Court stated as follows in syllabus point three of *Rowe v. Whyte,* 167 W.Va. 668, 280 S.E.2d 301 (1981): "[t]he decision to grant or deny parole is a discretionary evaluation to be made by the West Virginia [Parole Board]. However, such a decision shall be reviewed by this Court to determine if the [Parole Board] abused its discretion by acting in an arbitrary and capricious fashion." In syllabus point three of *State ex rel. Eads v. Duncil,* 196 W.Va. 604, 474 S.E.2d 534 (1996), this Court explained that "The West Virginia [Parole Board] must obey legislation and must act in a way which is not unreasonable, capricious, or arbitrary."

Regarding Mr. Patton's contention that the Board failed to satisfy the requirements of *Eads,* this Court reviews such questions of law *de novo. See Phillips v. Fox,* 193 W.Va. 657, 661, 458 S.E.2d 327, 331 (1995) ("In reviewing challenges to . . . findings and conclusions . . . we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the . . . underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review").

## III. Discussion

### A. Contentions Regarding Revocation Hearing Testimony

We first address Mr. Patton's primary contention that the Board acted arbitrarily and capriciously in revoking his parole based upon what Mr. Patton characterizes as very technical violations of parole. During the September 19, 2002, hearing conducted by

Chairman Stump, the charges against Mr. Patton were developed and mitigating factors were explained. With regard to the allegation of a curfew violation, Mr. Patton explained that he broke the 9:00 p.m. curfew on April 11, 2002, as a direct result of employment obligations in his position as a member of a twenty-four hour towing crew. He further maintained that his parole officer had encouraged his participation in this employment and had knowledge of its particular hourly demands. He alleged that he had been called to the Good Times Bar in Dunbar to assist a stranded motorist. His employer, Mr. Lee Mullans, submitted a letter to the Board asserting that Mr. Patton had indeed been called on that employment mission.

With regard to the charge of driving on a suspended license[1] on May 13, 2002, Mr. Patton explained that a female customer had refused to drive her own vehicle from Advance Auto Parts to Mr. Patton's place of employment for the replacement of her brakes, due to her fear that the brakes would fail completely during that drive. Mr. Patton explained, during the revocation hearing, that he had telephoned his employer for advice concerning the customer's refusal to drive her own vehicle. Mr. Patton explained that his employer had advised him that the customer would have to pay a wrecker fee if the vehicle had to be towed from Advance Auto Parts to the location at which the brakes would be replaced. Thus, Mr. Patton agreed to drive the vehicle for the customer the one mile from Advance Auto Parts. At

the parole revocation hearing, Mr. Patton explained: "And when I pulled in, Pam [the parole officer making a routine check] was behind us. She seen her get out of the truck and a little kid and I showed Pam the brake shoes in my hand that I got from over there. I mean I wasn't supposed to be driving. You know, I can't be right and be wrong. And I tried to do somebody a favor. . . ."

With regard to the charge of alcohol possession on June 6, 2002, Officer Bryan Jones, the police officer who observed Mr. Patton purchasing the beer at a local Go–Mart, testified at the parole revocation hearing. He did not observe Mr. Patton drinking the beer, but he did notice that there was a woman in Mr. Patton's truck with him. With regard to the Go–Mart beer purchase, Mr. Patton testified that he had purchased a case of beer for his girlfriend. He also stated that he realized that he was a "recovering alcoholic" and that he had served as the chairman of Alcoholics Anonymous at the Huttonsville Correctional Center.

While Mr. Patton does not attempt to argue that the violations did not occur, he contends that the mitigating circumstances should have persuaded the Board to administer an alternative resolution of a less restrictive nature than total revocation of parole and replacement within the prison population. He further maintains that the Board failed to adequately evaluate less restrictive alternatives such as those provided by the West Virginia Legislature in West Virginia Code § 62–12–19(b) (1998) (Supp.2002),[2] ad-

---

1. Mr. Patton's license had been suspended due to unpaid traffic tickets. Mr. Patton contends that he did not receive meaningful assistance in obtaining a driver's license from his parole officer. West Virginia Code § 62–12–15 (1993) provides that parole officers "shall use all practical and suitable methods of aid and encourage persons on parole and to bring about improvement in their conduct and condition." We find no merit in Mr. Patton's allegation that his parole officer failed to fulfill any of her duties as his parole officer.

2. West Virginia Code § 62–12–19(b) provides:

When a parolee is under arrest for violation of the conditions of his or her parole, he or she shall be given a prompt and summary hearing, at which the parolee and his or her counsel shall be given an opportunity to attend. If at

the hearing it shall appear to the satisfaction of the board that the parolee has violated any condition of his or her release on parole, or any rules or conditions of his or her supervision, the board may revoke his or her parole and may require him or her to serve in prison the remainder or any portion of his or her maximum sentence for which, at the time of his or her release, he or she was subject to imprisonment: Provided, That if the violation of the conditions of parole or rules for his or her supervision is not a felony as set out in section eighteen of this article, the board may, if in its judgment the best interests of justice do not require revocation, reinstate him or her on parole. The division of corrections will effect release from custody upon approval of a home plan. Notwithstanding any provision of this code to the contrary, when reasonable cause has been found to believe that a parolee has

vocating alternative means of resolution, included substance abuse treatment programs, day reporting centers, and counseling programs. *See* West Virginia Code §§ 62–11C–5(d)(5), 62–11C–5(d)(8), 62–11C–5(d)(9) (2001). Mr. Patton contends that his rehabilitative efforts, including attendance of Alcoholics Anonymous meetings, the establishment of gainful employment, and the ability to maintain a constant place of residence, were indications that he had become a functioning, successful member of the public during his six months on parole.

In discussing possible alternative resolutions, Chairman Stump mentioned a program at St. Mary's Correctional Center, the Second Chance Program, designed to assist in treatment for alcoholism. Chairman Stump also alluded to the Pruntytown Correctional Center and stated that his preference would be placing Mr. Patton on electronic monitoring. During the hearing, Mr. Patton admitted that his sister, with whom he had established a residence, would not favor electronic monitoring since it would require constant supervision by a parole officer. Subsequent to the hearing, and off the record, the parole officer allegedly contacted Mr. Patton's sister and questioned the sister regarding her willingness to assist her brother in an electronic monitoring arrangement. The parole officer apparently thereafter reported the contents of such conversation to the Board, and a determination was made that there was no "home plan" since electronic monitoring would not be a feasible alternative. Parole was thereafter revoked.

■ Upon review of the evidence presented regarding the three charges, we find no abuse of discretion by the Board in investigating the alleged violations and in determining that the evidence was sufficient to warrant a finding that the violations did indeed occur. We further find no abuse of discre-

tion in the Board's decision not to implement less restrictive alternatives. The record reflects that the Board considered alternatives to placing Mr. Patton in prison and inquired into the possibility of home monitoring. While Mr. Patton alleges that the off-the-record conversation with his sister was improper and/or prejudiced him in some manner, we find that argument lacking in merit based upon the fact that Mr. Patton admitted during the revocation hearing that his sister would not be amenable to a resolution which included home monitoring at her home. Thus, any error in permitting off-the-record discussion of the matter was harmless.

### B. Review as Required by *State ex rel. Eads v. Duncil*

■ Mr. Patton also alleges that the entire Board did not provide adequate review of the evidence presented in the revocation hearing, as required by *Eads*. Syllabus point two of *Eads* instructs as follows:

> The record in parole revocation cases must affirmatively show that the documents and evidence produced in the revocation proceeding have been submitted to all duly appointed and qualified members of the West Virginia Board of Probation and Parole for consideration prior to the final decision, that the number of members considering such documents and evidence constituted a quorum for conduct of business by the Parole Board, and that a majority of the duly appointed and qualified members considering the documents and evidence must concur in any order revoking parole, either by signing the order or filing with the secretary of the Parole Board a written concurrence in such revocation, which may be then so certified by the chairman of the Parole Board, the secretary of the Parole Board, or a mem-

violated the conditions of his or her parole but said violation does not constitute felonious conduct, the commissioner may, in his or her discretion and with the written consent of the parolee, allow the parolee to remain on parole with additional conditions or restrictions. Such additional conditions or restrictions may include, but shall not be limited to, participation in any program described in subsection (d), section five, article eleven-c of this chapter.

Compliance by the parolee with such conditions of parole shall preclude revocation of parole for the conduct which constituted the violation. Failure of the parolee to comply with such conditions or restrictions and all other conditions of release shall constitute an additional violation of parole and the parolee may be proceeded against under the provisions of this section for the original violation as well as any subsequent violations.

ber of the Parole Board assigned to conduct the proceeding.

196 W.Va. at 605, 474 S.E.2d at 535.

Mr. Patton alleges that the audio tape quality was so poor that even the transcriber could not decipher all contents of the revocation hearing. Mr. Patton also contends that the Board members cast their votes based upon an incomplete record of the proceedings due to the poor quality of the recording equipment. The State maintains that there was ample evidence of parole violations and that the poor audio tape quality did not affect the validity of the Board's conclusions.

Our review of this matter reveals that the affidavit submitted by Chairman Stump specifies that he presented the issues to the other members of the Board in conference, discussed the allegations and evidence with the other members of the Board, and that the Board rendered a conclusion as an entire Board, as required by *Eads.* The affidavit evidences the Board's action in reviewing the Summary and Recommendation prepared by Chairman Stump. In these circumstances, we decline to conclude that the revocation of Mr. Patton's parole should be vacated.

Based upon the foregoing, we deny Mr. Patton's requested writ of habeas corpus.

Writ denied.

Chief Justice STARCHER and Justice ALBRIGHT dissent and reserve the right to file dissenting opinions.

Justice DAVIS concurs.

ALBRIGHT, Justice, dissenting:

(Filed July 2, 2003)

I respectfully dissent to the majority's opinion, based upon the absence of meaningful consideration of mitigating circumstances and alternative dispositions and upon the Board's failure to satisfy the principles announced in *State ex rel. Eads v. Duncil,* 196 W.Va. 604, 474 S.E.2d 534 (1996).

In *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the United States Supreme Court explained that a parole revocation proceeding is a two-step process. The first step in a revocation decision involves the "wholly retrospective factual question" of whether a parolee has actually violated one or more of the conditions of his parole. 408 U.S. at 479, 92 S.Ct. 2593. The second prong of the inquiry is whether revocation is appropriate under the circumstances of the particular case or whether other steps should be taken to both protect society and improve the parolee's chances of rehabilitation. *Id.* at 480, 92 S.Ct. 2593; *see also Morgan v. MacLaren School, Children's Services Div.,* 23 Or.App. 546, 543 P.2d 304, 307 (1975). This two-step procedure has been extensively analyzed, and one commentator has explained that the decision to revoke parole involves two separate determinations, as follows:

> The first is a narrow factual determination that the parolee has committed an act which is a violation of his parole. This determination includes findings regarding the circumstances in which the violation occurred. Generally the Board's factual determination is either admitted or not actively contested by the parolee, because revocation proceedings are seldom initiated unless there has been a clearcut violation. If the parole officer's allegations are disputed, the source of dispute is more likely to concern the circumstances surrounding the charge rather than the violation itself, which often appears on its face to be only a technicality.
>
> The second determination in the revocation decision is whether the violation and the circumstances in which the violation occurred justify revocation, giving due consideration to the parolee's overall conduct. To decide, the Board must weigh the severity of the parolee's conduct in the situation in which a violation was found against mitigating factors regarding the parolee's overall conduct. This weighing of adverse and mitigating factors is a value judgment involving a prediction of the risk of continued socially proscribed conduct by the parolee.
>
> The state has the initial responsibility of producing evidence indicating the occurrence of a violation and the presence of surrounding circumstances serious enough to justify revocation. Generally, the evidence is the investigating parole officer's

report, which was the basis for his recommendation that parole be revoked. If the Board determines that a violation has occurred, the parolee must produce evidence substantiating the existence of mitigating factors which persuade the Board that revocation is not justified. Such mitigating evidence may involve an explanation of the situation in which the violation occurred or the introduction of information regarding the parolee's general conduct which is not directly related to the circumstances of the violation.

Comment, *Due Process for Parolees: Oregon's Response to Morrissey v. Brewer*, 53 Or.L.Rev. 57, 59–60 (1973) (footnotes omittes).

The essential second stage must not be overlooked. As noted by the Supreme Court of Washington in *Petition of Haverty*, 94 Wash.2d 621, 618 P.2d 1011 (1980), "[t]he integrity of the *revocation* fact-finding process, the method through which the decision to revoke is made, is obviously affected by failure to consider in a mitigation hearing those factors given constitutional significance by *Morrissey*." *Id.* at 1013; *see also Nixon v. Quick*, 781 A.2d 754, 763 (D.C.2001) (noting that the parole board "had available to it a number of alternative options as sanctions for Nixon's violations, including modification of the conditions of parole, reprimand, reinstatement of supervision, and residential community treatment"); *Commonwealth ex rel. Rambeau v. Rundle*, 455 Pa. 8, 314 A.2d 842 (1973) (implementing the *Morrissey* two-step revocation procedure in Pennsylvania).

Thus, the duty of the Board in the present case must be recognized as two-fold. In consideration of the first prong, the Board correctly determined that the charged violations occurred. But, it essentially stopped there. The second prong was not evaluated. Three members of this Court apparently agree with that truncated version of the inquiry and have affirmed the action of the Board. Yet, the second half of the story, as required to be developed by *Morrissey*, remains incomplete. No meaningful inquiry into potential alternatives was conducted; no significant consideration of mitigating circumstances is reflected in the record.

Indeed, Mr. Patton did drive a very short distance on a suspended license; he was out after his 9:00 p.m. curfew; and he did buy beer at a Go–Mart. For the Board and the majority of this Court, that is the end of the story, and Mr. Patton is returned to prison. Glaringly absent from such consideration is an inquiry into the reasons for Mr. Patton's actions. Additional considerations should have been addressed with regard to the circumstances under which these violations occurred and the extent to which the context of a violation affects the selection of punishment for that violation. Aristotle concisely explained that "we do not know a truth without knowing its cause."

These questions appear to have been deemed irrelevant by the Board and by the majority of this Court, in blatant disregard for the principles announced in *Morrissey* and in derogation of the specific guidelines promulgated by the West Virginia Legislature. In syllabus point three of *Eads*, this Court has expressly stated that "[t]he West Virginia [Parole Board] must obey legislation and must act in a way which is not unreasonable, capricious, or arbitrary." 196 W.Va. at 605, 474 S.E.2d at 535. In discussing his interpretation of the statutory vision regarding alternative dispositions, Chairman Stump stated as follows in the present case: "We have too many [bills] over there [at the Legislature]. But until the Legislature decides to put some cash behind it, it's not going to go very far. You know, they do that often. God love their heart. And they don't have a lot of cash."

There was a duty in this case to analyze not only the reality of the violations but the mitigating factors and potential alternatives to return to prison, as legislatively envisioned. That duty was unfulfilled. The result was an arbitrary and capricious judgment which should have been reversed by this Court. In its haste, the majority of this Court could see no further than the bare existence of the violations. Through such oversight, this Court has sanctioned the Board's disregard of mitigating circumstances and alternative disposition options and has ratified a miscarriage of justice which has quite possibly destroyed the poten-

tial for Mr. Patton's rehabilitation and reintegration as a contributing member of society.

I do not advocate absolution of all responsibility for these parole violations. The violations did occur, and the precipitating factors should have been addressed in a manner which alerted Mr. Patton to the seriousness of any parole violation, no matter how minor it may facially appear. The precipitating factors should also have been examined in an attempt to realign Mr. Patton's curfew restrictions to the realities of his employment obligations. Yet these rehabilitative potentials were essentially ignored, and the Board's action was condoned by the majority of this Court.

I also disagree with the majority's holding that the Board complied with the principles announced in *Eads*. Syllabus point two of *Eads* specifies that the record must "affirmatively show that the documents and evidence produced in the revocation proceeding have been submitted to all duly appointed and qualified members of the [Board]. . . ." 196 W.Va. at 605, 474 S.E.2d at 535. The failure in *Eads* was substantially more egregious, based upon the absence of any documentation demonstrating that the full Board considered the revocation and the fact that the parole revocation order was signed by only one member of the Board. 196 W.Va. at 611, 474 S.E.2d at 541. Yet, in the present case, the Board members who were not present at the hearing did not have the benefit of a complete transcript or an audible taped version of the hearing. They relied almost exclusively upon the presentation of evidence by only one member of the Board. West Virginia Code of State Regulations § 92–1–13.1 permits "[o]ne member of the Board" to be present at the hearing; yet § 92–1–15 requires that "[u]pon review of the hearing transcript or upon receipt of the waiver of the hearing . . . [,]" the Board will render an ultimate decision. The affidavit signed by Chairman Stump evidences no review of a hearing transcript in the present case. Chairman Stump states only that he "met with the other two signing members of the Board, Christi Love and Benita Murphy, and discussed this matter thoroughly after they had reviewed my written Summary and Recommendation." Thus, from the record before this Court, it appears that the explicit directive of West Virginia Code of State Regulations § 92–1–15 was not followed.

The Board declined to meaningfully consider mitigating factors or less restrictive alternatives, and it failed to adhere to the principles of *Eads* and the distinct mandates of the West Virginia Code of State Regulations. Moreover, herein lies an additional example of the failure of the Board to provide significant guidance to the parolee on what precisely is expected of him. This individual found a steady job; yet, the hours of the job prompted this claim against him. He was working in a situation where driving a vehicle might become necessary; yet, it does not appear that any meaningful consideration was given to that potentiality. As I emphasized in my concurrence and dissent in *State ex rel. Stollings v. Haines*, 212 W.Va. 45, 569 S.E.2d 121 (2002), within the context of denial of parole,

This Court should be encouraging the Parole Board to further develop its ability to give a person who is denied parole a clear picture of what must be done, or not done, to bring that prisoner's "liberty interest" in the "expectation of parole" beyond expectation to fruition. *Tasker,* 165 W.Va. at 59–60, 267 S.E.2d at 186–87. In my view, our task is not to set those standards (except as we must to assure due process). The development of such standards is, in the first instance, the proper work of, and within the statutorily protected expertise of, the Board. The problem here is that the failure to further develop the ability of the Board to give a person denied parole a clear picture of what must be done or not done to earn parole almost guarantees that on another day, in another case, this Court will find itself compelled to intervene to assure due process, a fundamentally fair proceeding, and one that reaches conclusions to grant or deny parole in accord with the *objective criteria* provided by the parole statute. From my review of current literature on the subject, there are a myriad of tools available, means to defining and articulating reasonable standards for the difficult decisions the Board must make—tools that also assure that the Board's decisions cannot reasonably be found to be arbitrary

.

and capricious, tools that may be applied within the integrated framework of our sentencing statutes and the parole provisions of our Code.

*Id.* at 53–54, 569 S.E.2d at 129–30. These types of decisions involve some degree of judgment and intuition. However, a discord is created by the failure to develop and adhere to a specific set of meaningful standards by which parole violations and potential revocations are to be judged. As cited above, this Court has invited such development; yet to this point, there is no indication that any movement toward such development has been initiated.

I am in unqualified agreement with any parole revocation decision necessary to protect the public. However, it must be recognized that the problem of prison overcrowding stems, in part, from the low parole release rates in the State of West Virginia. Criminal justice records indicate that while West Virginia's crime rate remains one of the lowest in the nation, the state's prison population is increasing at an alarming rate. Recent data from the state's parole board indicates that only fifteen percent of West Virginia prisoners facing their first parole hearing receive parole. The data also suggests that the percentage of interviewed inmates who actually receive parole has been consistently decreasing since 1990. The suggestion, forwarded in public debate, that the West Virginia prison population includes more violent offenders than other state prison populations and that these statistics justify this state's low parole release rates is somewhat implausible.

Parole revocation determinations, such as the one under review in the present case, comprise only one component of this extensive issue. If meaningful standards for granting or revoking parole were developed, an element of predictability would be introduced into the system. Adequate psychological examinations and other prognosticative tools, in conjunction with articulated standards, would likely achieve several positive results: (1) reduction in the potential that an initial intuitive judgment would be wrong; (2) increase in potential that a judgment to retain an individual would operate to protect the public from truly dangerous criminals;

(3) providing inmates who are genuinely striving toward parole with confidence in the integrity of the system, generating more favorable behavior and work results; (4) providing the public with the confidence that where release determinations—even those ultimately proven wrong—are reached for good reason readily apparent from the record and based on clearly articulated methodologies; and (5) probable reduction in recidivism rates.

Although this Court should certainly not be in the business of second guessing every parole revocation determination, the absence of clearly articulated standards leaves this Court with no alternative to setting aside any blatantly arbitrary and capricious decision. I consequently take this opportunity to once again urge the development of clearly articulated and meaningful standards for the determination of these vital issues of revocation of parole. The system has shamelessly failed Mr. Patton in the present case, and I must therefore respectfully dissent to the majority opinion.

I am authorized to state that Chief Justice STARCHER joins in this dissenting opinion.